UNITED STATES of America ex rel. Duane WOODARD, Attorney General of the State of Colorado, and the State of Colorado, Plaintiffs-Appellees,

v.

COUNTRY VIEW CARE CENTER, INC., a Colorado corporation, Lawrence Fried, Louis L. Fox and David Zapiler, Defendants-Appellants.

Nos. 84–1110, 84–1301.

United States Court of Appeals, Tenth Circuit.

July 28, 1986.

---

Lee Jay Belstock, Denver, Colo., for defendants-appellants.

Gregory C. Smith, Deputy Atty. Gen. (Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., and Richard H. Forman, Sol. Gen., with him on brief), Denver, Colo., for plaintiffs-appellees.

Before SEYMOUR and SETH, Circuit Judges, and BROWN, District Judge *.

SETH, Circuit Judge.

This is an appeal from a judgment against defendants in an action brought by the relators Attorney General and State of Colorado in the name of the United States as *qui tam* plaintiffs under section 232(B) of the False Claims Act. 31 U.S.C. §§ 231–235 (currently codified at sections 3729–3731). The complaint alleged that Country View Care Center (Country View) and its shareholders, Lawrence Fried, Louis L. Fox and David Zapiler, filed twenty-five false claims and four false cost reports with the Colorado Department of Social Services seeking reimbursement under the medicaid program. Colo.Rev.Stat. §§ 26–4–101 to 116 (1982). The result of these false cost reports and claims was that the defendants were overpaid $44,959 by the medicaid program. On appeal, de-

fendants contest both the damages awarded and the jurisdiction of the district court.

In the State of Colorado the federal medicaid program is administered by the Colorado Department of Social Services pursuant to the Colorado Medical Assistance Act, Colo.Rev.Stat. §§ 26–4–101 to 116 (1982). During the period between 1976 and 1978 the program was jointly funded by federal and state sources with the United States Department of Health and Human Services funding approximately 54% of the program cost and the State of Colorado the remainder.

In the course of administering the medicaid program the Department of Social Services enters into "Provider Agreements" with licensed nursing homes. These agreements provide a mechanism for reimbursing the nursing homes for services provided to medicaid eligible residents. The reimbursement mechanism requires the nursing homes to submit a monthly claim for reimbursement against which is applied a reimbursement rate which is individually determined for each nursing home. The reimbursement is determined by the Department of Social Services on the basis of cost reports which are submitted by each nursing home every six months. If a nursing home includes unjustified expenses in its cost report the reimbursement rate will be inflated and its application to the monthly claim for reimbursement will result in an overpayment from the medicaid fund. That is the exact nature of the fraud charged by the complaint against the owners of Country View Care Center.

Lawrence Fried, Louis Fox and David Zapiler took over Country View Care Center as sole owners, officers and directors. In June 1976 they entered into a management contract with the Arvada Management Company under which Arvada was to provide "consulting services" to the defendants as operators of Country View. Over the next eighteen months Country View made payments to Arvada Manage-

* Honorable Wesley E. Brown, United States District Judge for the District of Kansas, sitting by    designation.

ment with a total of $44,765, which were included in the four cost reports submitted by Country View to the Department of Social Services through May 1978. The trial court found that the effect of including the Arvada Management contract costs in those four cost reports resulted in Country View being reimbursed a total of $44,959.

The real purpose of these payments becomes obvious once the payments are traced through Arvada Management. From the first payment to Arvada, 80% or $21,974 was actually remitted to the owners of Country View purportedly as a payment for consulting services rendered by the defendants for Arvada. Such was the pattern with all four of the payments made by Country View; exactly 80% of the payment split among Fried, Fox and Zapiler. The procedure was usually to have the Country View check replaced with cashiers checks drawn out to the defendants.

The trial court's findings of fact demonstrate that very few, if any, services were actually provided to Country View pursuant to the "consulting" contract with Arvada Management. The consulting contract was merely a device through which Country View could funnel reimbursable "kickbacks" to its owners. The 20% retained by Arvada Management reflected the split negotiated by the operators of Arvada for acting as the conduit for the kickback scheme. The district court specifically found that the defendants' proffered explanation that they had actually provided consulting services to Arvada was incredible.

In accordance with 31 U.S.C. § 231 the court awarded damages against the defendants of double the overpayment or $89,918 and forfeitures of $2,000 for each of the four false cost reports and twenty-five false reimbursement claims or $58,000. Consistent with section 232(E)(2) of the Act, 25% of the total award of $147,918 was awarded the Attorney General of the State of Colorado as the successful *qui tam* plaintiff.

In order to exercise a private right of action under the FCA the *qui tam* plaintiff must provide the United States Attorney General with a copy of the complaint and "a disclosure in writing of substantially all evidence and information in his possession material to the effective prosecution of such suit." 31 U.S.C. § 232(C) (revised and recodified at § 3730(b)(2)). Following notification the government has sixty days in which to enter an appearance. If the United States does elect to participate in the action, the *qui tam* relator is entitled to 10% of plaintiff's recovery. Should the government choose not to participate, as here, the *qui tam* plaintiff receives 25% of the award to the United States. Also contained in section 232(C) is a jurisdictional bar designed to limit plagiarism on the part of *qui tam* relators. This jurisdictional bar applies "whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(C) (revised and recodified at § 3730(b)(4)). Yet another statutory provision pertaining to medicaid fraud reporting requirements and tangentially relevant to this appeal is 42 C.F.R. § 455.17 (1980).

In order to comply with the notification provisions of section 232(C), the relator served a copy of the complaint upon the United States Attorney for Colorado and sent another copy and a letter to the Attorney General of the United States. The letter was dated and sent on July 8, 1982 when the complaint was filed. The portion of the letter describing the evidence possessed at that time read as follows:

"The evidence supporting the allegations in the complaint includes 1) copies of the cost reports, 2) microfilm prints of remittance advices, 3) copies of letters sent by Social Services advising of rate calculations for Country View, 4) microfilm prints of original patient claim forms submitted by defendants and 5) report No. LD–40–R10–1 nursing home paid claims for service date by process date."

Appellants have raised a number of questions on the jurisdiction of the trial court.

The first is that the above quoted letter and copy of the complaint provided to the United States Attorney General failed to disclose substantially all the evidence in the relator's possession. The alleged failure to comply with the notification requirements of section 232(C) would defeat the relator's authority to pursue the *qui tam* action.

It seems clear that the purpose of the notification provision is twofold. The primary purpose is to provide the United States with enough information on alleged fraud to be able to make a well reasoned decision on whether it should participate in the filed lawsuit or allow the relator to proceed alone. The second reason for the notification is to allow the government to determine whether it previously possessed the information on which the suit is based thereby giving the government an opportunity to defeat the district court's jurisdiction over the *qui tam* action.

■ The complaint and letter clearly disclose that the relator has in its possession numerous cost reports, remittance advices, claim forms and other reports which indicate that Country View Care Center was engaged in a "kickback" scheme utilizing false cost reports and resulting in an overpayment of medicaid funds. We reject appellants' contention that the relator's failure to include copies of the physical evidence or discuss the importance of specific pieces of evidence implies a failure to disclose substantially all evidence in his possession. The United States was promptly notified of the program which was being defrauded, the suspected party, the nature and operation of the fraud, and the nature of the physical evidence establishing the false claims. Thus the United States was provided with ample information to make an informed decision on its possible participation and we therefore concur in the district court's conclusion that the relator fully complied with the notification requirements.

■ The other apparent purpose of the notification requirement is the subject of appellants' next jurisdictional challenge. Appellants contend that 42 C.F.R. § 455.17 requires the state in its management of this program to notify the United States Health and Human Services Department of any suspected instances of fraud. The notices and information sent to the Attorney General described above was sufficient under the Regulation cited, and was timely under the record before us. The notices served both purposes.

■ We must conclude that there has been no showing that the suit was based upon evidence or information in the possession of the United States and therefore the district court had jurisdiction.

The appellants also argue on appeal that the case should have been dismissed because they were unable to present crucial documentary evidence by reason of a state trial court order sealing those documents and because the plaintiff misled the trial court below on the true nature of the state court order.

These records at issue are for the most part those of the Arvada Management Company and appellants claim they would corroborate their claims to have actually provided consulting services exactly equal in value to 80% of the total payments from Country View to Arvada. The state court ruling referred to arose out of a criminal action filed in 1979 against Robert Tynan, operator of Arvada Management. The criminal action was dismissed in the wake of a state court ruling suppressing and sealing the documents as illegally seized from Arvada. *See United States ex rel. Woodard v. Tynan*, 776 F.2d 250 (10th Cir.1985).

■ This court must agree with the district court's characterization of appellants' explanations as incredible since they refrained from any effort to secure their release. No bona fide effort was made.

Lastly, appellants contend that the award of damages to plaintiffs was erroneous because it awarded double damages to the United States on the entire amount of the $44,959 overpayment. Specifically they argue that there was uncontroverted testi-

mony at trial that 46% of the medicaid program from which the claims were paid was funded by the State of Colorado and therefore false claims were not submitted against the United States to that extent. Appellants do not contest the calculation and award of forfeiture damages.

Upon review we must agree that the double damages award to the United States was excessive. This conclusion follows from the application of cases decided under the False Claims Act which measure the United States' injury as the difference between what the government actually paid and the amount it would have paid in the absence of the fraudulent claim. *See United States v. Thomas,* 709 F.2d 968, 972 (5th Cir.1983); *United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 63 (8th Cir.1973). In this case, had the false Arvada Management costs not been reported and claimed against, the federal government would have saved only 54% of the $44,959 overpaid to Country View because that was its funding contribution to the program. Thus it is the federal government's share of the overpayment which must be doubled to arrive at the proper amount of double damages awarded to the United States.

■ With respect to the state's share of the loss from the fraudulent claims, the *qui tam* plaintiff State of Colorado sought to include a pendent claim of state common law fraud for its portion of the overpayment. However, the trial court refused to permit the *qui tam* plaintiff to amend its pleadings to conform to the evidence and instead characterized the entire overpayment as recoverable by the United States under the False Claims Act. Appellants argue that the *qui tam* plaintiff's own losses are not recoverable under the False Claims Act and the defrauded plaintiff is limited to 25% of the award to the federal government. We note that although there is case law defining the availability of actions under the False Claims Act in the context of federal-state jointly funded programs such as Medicaid, *United States ex rel. Marcus v. Hess,* 317 U.S. 537,

63 S.Ct. 379, 87 L.Ed. 443 (1943), and *United States v. Kates,* 419 F.Supp. 846 (E.D. Pa.1976), it appears that the specific issue of the *qui tam* plaintiff's own losses has not been discussed. We conclude that the *qui tam* plaintiff's losses in an instance such as this are recoverable under the False Claims Act.

This conclusion is first suggested by a literal interpretation of the statute itself. Section 3730(b)(1) provides that a civil action may be brought *"for the person* and for the United States Government." (Emphasis added.) More specific and restrictive language could easily have been employed by Congress to limit such actions in the way suggested by appellants. A literal translation of the term *"qui tam"* reveals that it is an action in which the plaintiff sues for the state *as well* as himself. *United States ex rel. Vance v. Westinghouse Elec. Corp.,* 363 F.Supp. 1038, 1040 (W.D.Pa.1973); 1A C.J.S. *Actions* § 4. It is obvious that the "as well as for himself" traditionally referred to the informer's percentage of the recovery but with the demonstrated direct impact of the fraud on the state the meaning is broader. This suit was that of the State of Colorado with it in complete control. The statute of course eliminated any standing problem.

As stated above, many cases have previously concluded that actions under the False Claims Act may lie where the impact of the fraudulent claim does not fall exclusively upon the federal treasury. *See also United States v. Azzarelli Const. Co.,* 647 F.2d 757 (7th Cir.1981); *United States v. Jacobson,* 467 F.Supp. 507 (S.D.N.Y.1979). It should be noted that the appellants cite the *Azzarelli* decision for the proposition that the state's loss from the fraudulent claim is not recoverable. We think that contention misapplies the specific holding of *Azzarelli.* In that case the State of Illinois, pursuant to the Federal-Aid Highway Act, obtained a fixed amount of federal funding to assist in the construction of two highway projects. In the course of the project false claims were submitted against the state agency administering the project.

The court there upheld a dismissal of an action under the False Claims Act because the federal government had suffered no injury. The court noted that the federal contribution was fixed in advance and the federal government was therefore insulated from any overcharges. The court distinguished such a situation from one in which the federal government's funding commitment was "open-ended" where the submission of false claims would have a continuing adverse effect upon the federal treasury. The strict holding therefore seems to be that there is no cause of action under the False Claims Act where there is no injury to the federal government. Such is not the case here and *Azzarelli* makes no reference to the recoverability of the state's false claim losses where the False Claims Act has been violated.

■ By allowing the *qui tam* plaintiff here to recover for itself its share of the fraudulent overpayment (not doubled) and the United States to recover its amount doubled provides an allocation of damages in accord with the shared funding of the program which paid the fraudulent claims. It is acknowledged that in the traditional "informer" type *qui tam* action the plaintiff will have suffered no economic loss but where, as here, the *qui tam* plaintiff's injury occurs simultaneously with the federal government's injury the state should not have to pursue a state law claim in another proceeding.

Referring again to the motion of the state to amend to conform to the proof and to assert a pendent claim, we must hold that it was error not to permit such an amendment since the claim had been litigated. No good reason appears why the motion should not have been granted.

Having affirmed the trial court's judgment on all matters save the damages issue, the case is remanded to the trial court for a redetermination of the award consistent with this opinion.

IT IS SO ORDERED.

SEYMOUR, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's analysis and disposition of this case except for its treatment of the *qui tam* plaintiff's own common law fraud claim. I cannot agree that federal jurisdiction under the applicable statutes extends to a *qui tam* plaintiff who seeks to recover for damages allegedly suffered by him individually, and I therefore dissent from the majority's conclusion to the contrary. Historically, *qui tam* statutes provide for actions by one " 'who himself has no interest whatever in the controversy other than that given by statute....' " *United States v. Hess*, 317 U.S. 537, 541 n. 4, 63 S.Ct. 379, 383 n. 4, 87 L.Ed. 443 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225, 26 S.Ct. 31, 34–35, 50 L.Ed. 157 (1905)).

The False Claims Act provides that "[a] person may bring a civil action *for a violation of section 3729 of this title* for the person and for the United States Government." 31 U.S.C. § 3730(b)(1) (1982) (emphasis added). Section 3729 is concerned only with false claims against the federal government. Thus when sections 3730 and 3729 are read together, the Act creates federal jurisdiction only over claims resulting in damage to the federal government, not damage to the *qui tam* plaintiff individually.

In my view, the words "for the person" in section 3730(b)(1) refer only to the *qui tam* plaintiff's ability, pursuant to section 3730(c)(1) and (2), to recover a percentage amount for his own benefit out of the proceeds of the action, that is, out of the amount of damage accruing to the government. This construction comports with the private attorney general theory Congress intended to implement by these provisions. *See Public Interest Bounty Hunters v. Board of Governors*, 548 F.Supp. 157, 161–62 (N.D.Ga.1982).

I agree that it would be more efficient to allow a *qui tam* plaintiff to bring his own claim against the defendant along with the claim on behalf of the Government. However, this efficiency can be accomplished by

pendent jurisdiction over the plaintiff's state claim. I am unwilling to be the first court to extend federal jurisdiction beyond the statutory language, particularly when the *qui tam* plaintiff in this case has not asked us to do so. Because I agree that plaintiff properly presented a pendent state claim, I concur in affirming the award of damages to plaintiff for its own losses.