UNITED STATES of America ex rel. Bracha GRABER, Plaintiff,

v.

The CITY OF NEW YORK, The Human Resources Administration of the City of New York, The Department of Social Services of the City of New York, The Child Welfare Administration of the City of New York, The State of New York, and The State Department of Social Services, Defendants.

No. 93 Civ. 8984 DC.

United States District Court, S.D. New York.

June 12, 1998.

---

Mary Jo White, U.S. Atty., by Glenn C. Colton, James L. Cott, M. Chinta Gaston, Kathy S. Marks, Gideon A. Schor, Assistant United States Attorneys, New York, NY, for the United States.

Morrison & Foerster, by Carl H. Loewenson, Jr., William E. Zuckerman, New York, NY, for the relator.

Michael D. Hess, Corporation Counsel of the City of New York, by Marjorie B. Landa, Hilary B. Klein, Melvin L. Goldberg, Gail Rubin, Assistant Corporation Counsels, New York, NY, for the city defendants.

Dennis C. Vacco, Attorney General of the State of New York, by Vincent Leong, Assistant Attorney General, New York, NY, for the state defendants.

## OPINION

CHIN, District Judge.

In this *qui tam* action, the United States of America accuses the City of New York (the "City"), the State of New York (the "State"), and various city and state agencies of committing welfare fraud. Seeking to invoke the

False Claims Act, a 135–year–old statute originally enacted in response to rampant overbilling by Civil War defense contractors, the United States sues the City, the State, and certain of their agencies for upwards of $100 million in damages, contending that they submitted false claims for federal reimbursement of foster care expenditures.

The United States sues for treble damages and penalties under the False Claim Act, 31 U.S.C. §§ 3729 *et seq.*, as well as for damages under common law theories of unjust enrichment, mistake of fact, and fraud. Defendants move to dismiss the case, or in the alternative, for summary judgment. They argue, *inter alia,* that cities and states are not "persons" within the meaning of the False Claims Act. The United States opposes defendants' motion to dismiss and, in turn, cross-moves for summary judgment.

For the reasons set forth below, defendants' motions to dismiss are granted in part and denied in part. The claims under the False Claims Act are dismissed, for neither the text nor the legislative history of the statute reveals any intent on the part of Congress to subject states or municipalities to liability under the Act. The False Claims Act was passed to protect the taxpayers. It was not intended to provide the federal government with a means to punish city and state taxpayers for the alleged wrongdoing of their local government officials.

Because genuine issues of fact remain as to the common law claims, however, the parties' cross-motions in all other respects are denied.

### BACKGROUND

#### A. *The Allegations of the Amended Complaint*

The amended complaint alleges that defendants submitted false claims, statements, and records to obtain federal incentive funding and reimbursement for foster care expenditures under Title IV of the Social Security Act, 42 U.S.C. §§ 620, 670. (Am.Compl.¶ 1).

I examine below the structure and objectives of Title IV of the Social Security Act, as well as the United States's contentions as to each set of defendants.

#### 1. *Title IV of the Social Security Act*

Title IV of the Social Security Act is dedicated to "protecting and promoting the welfare of all children, .... preventing the unnecessary separation of children from their families ... and assuring adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption." Social Security Act ("SSA") § 425(a)(1), 42 U.S.C. § 625(a)(1). To fulfill these goals, Congress created a statutory framework through which federal funds would be made available to eligible states, thereby "enabling each State to provide, in appropriate cases, foster care and transitional independent living programs for children who otherwise would be eligible for assistance." SSA § 470, 42 U.S.C. § 670.

Under the established framework, a state is not eligible to receive incentive funds for foster care unless it has "completed an inventory of all children ... in foster care ... and determined the appropriateness of ... foster placement," installed a "statewide information system from which can be readily determined the status, demographic characteristics, location, and goals for the placement of every child," implemented a "case review system ... for each child," and established a "service program designed to help children ... return to families from which they have been removed or be placed for adoption ... or [provided with] some other planned, permanent living arrangement." SSA §§ 422(B)(9)(A), (B)(i), 427(a)(2)(C), 42 U.S.C. §§ 622(b)(9)(A), (B)(i), 627(a)(2)(C).

Program Instructions for the U.S. Department of Health and Human Services ("HHS") provide that in the first year a state seeks incentive funding, 66% of its cases must satisfy the requirements of § 427 of the Social Security Act, 42 U.S.C. § 627, that in the second year 80% of the cases must satisfy the requirements, and that for each year thereafter, 90% of the cases must satisfy the requirements. Failure to comply with these standards may result in the disgorgement of incentive funding to which a state is not

entitled and in the determination by HHS that the state is not eligible for further funds.

## 2. *The State Defendants' Role*

The State Defendants have been sued for accepting federal foster care funding to which they supposedly knew or should have known they were not entitled.

By 1990 the State was required to meet the 90% threshold established by HHS instructions. Between 1990 and 1994, the State certified its compliance with § 427. In turn, it received federal incentive funding totalling $37,432,436 over the course of the five fiscal years. The United States avers that the State accepted these funds knowing full well, or at least in "reckless disregard" of the fact, that its own records showed that it was not in compliance with the 90% threshold set forth in the HHS instructions. (*See* Am. Compl. ¶¶ 22–24).

## 3. *The City Defendants' Alleged Scheme*

The allegations against the City Defendants are centered on a purported scheme to falsify compliance information provided to the State, which, in turn, was passed on to the United States and apparently relied upon by it in determining the State's eligibility for incentive funds. The United States alleges that the City's Division of Adoption and Foster Care Services ("DAFCS"), with the knowledge of high-ranking officials of the Child Welfare Administration of the City of New York ("CWA"), pursued a scheme of knowingly entering false data based on incomplete or outdated records into the Child Care Review Service ("CCRS"), a state computer system. (*See* Am.Compl. ¶¶ 47–48). In addition, the City Defendants allegedly failed to conduct required service plan reviews and accurately document that services actually were provided to foster children and their families.

Bracha Graber, the *qui tam* relator in this case, served as Acting Director of CWA's Office of Case Management ("OCM") during the relevant time period. Graber purportedly learned of the alleged scheme to defraud and made repeated efforts to inform City and State authorities of her observations. In April of 1991, she allegedly sent anonymous letters to Barbara J. Sabol, then-Administrator of the Human Resources Administration of the City of New York ("HRA") and Commissioner of the New York City Department of Social Services ("NYCDSS"), and then-Executive Deputy Commissioner of CWA Robert L. Little, informing them of the alleged false claims scheme at DAFCS. In or about February of 1992, she sent another anonymous letter to the City's Office of the Comptroller. (Am.Compl.¶¶ 57–60).

Toward the end of 1992, Graber allegedly met with Walter Mendelson, Assistant Director of the staff from the State Comptroller's Office. After hearing about the alleged scheme at DAFCS, Mendelson "promised Graber that he would investigate the allegations," but Graber never heard from him again. (Am.Compl.¶ 61).

In or about May 1993, Graber met with Little and then-Deputy Commissioner for Protective Services and Case Management Mary C. Bradley. During this meeting, Little allegedly asked Graber to involve OCM in the false claims scheme and told her that an audit of their activities, if one were ever initiated, would not be uncovered until Bradley had left office, and that, in any event, any investigation would ultimately return to CWA, where it would languish indefinitely. At this meeting, Graber apparently declined to participate in the alleged scheme.

On or about December 1993, Bradley purportedly told Graber not to inform any incoming HRA executives about the existence of the false claims scheme. Indeed, she purportedly told Graber that she should not "snitch" on her "brothers and sisters." (Am.Compl.¶ 64).

## B. *Procedural History*

Graber filed the instant action on December 29, 1993 "for [herself] and for the United States Government" pursuant to 31 U.S.C. § 3730(b)(1). In January 1996, after a two-year investigation, the United States intervened in this case as the real party in interest and filed an amended complaint.

The amended complaint sets forth fourteen causes of action. The first eight counts al-

lege violations of the False Claims Act. Counts I and II allege that defendants knowingly presented or caused to be presented false claims for incentive funding and reimbursement for foster care spending; Counts III and IV allege that defendants made false records or statements to gain approval for incentive funds; Counts V and VI accuse defendants of using false records or statements to conceal, avoid, or decrease monetary obligations to the United States; and Counts VII and VIII allege that defendants conspired to defraud the United States for purposes of obtaining payment on false claims for reimbursements and incentive funding. The remaining counts (Counts IX–XIV) assert various common law claims: unjust enrichment, mistake of fact, and fraud.

These motions followed.

## DISCUSSION

### A. *The False Claims Act*

The False Claims Act provides in pertinent part that

> any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

31 U.S.C. § 3729(a). The statute reaches not only the actual submission of a false claim, but also the making of a record or statement to obtain payment or approval of a false claim, conspiracy to obtain payment or approval of a false claim, the possession, custody or control of property or money used to defraud the Government, the illegal purchase of a pledge of obligation or debt or public property from an officer or employee of the Government, and the making of a false record to "conceal, avoid or decrease" a financial obligation to the Government. *See* 31 U.S.C. §§ 3729(a)(2)–(7).

A false claim "includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides a portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

### B. *Defendants' Motions to Dismiss*

The term "any person," as used in § 3729(a), is not defined in the False Claims Act. The principal question thus presented by defendants' motions to dismiss is whether the term "any person" in § 3729(a) includes states and municipalities and their respective instrumentalities. Although the State and City Defendants present slightly different arguments, both sets of defendants argue that they are not "person[s]" subject to liability under the False Claims Act. In the end, their respective motions to dismiss turn on the same issue: whether Congress intended to subject states and cities to False Claims Act liability. This question must be considered against the backdrop of the well-established principles, described below, that states ordinarily are not "persons" where statutes impose a burden or limitation and cities ordinarily are not "persons" where statutes impose exemplary damages.

### 1. *Basis for the State Defendants' Motion*

The State Defendants move to dismiss principally on the ground that they are not "persons" within the meaning of the False Claims Act. They contend that they may not be sued under the statute because the term "person" in § 3729 does not explicitly include states and the legislative history does not indicate that Congress meant to impose liability on states. Alternatively, the State Defendants argue that the Eleventh Amendment precludes these claims because Congress has not abrogated state sovereign immunity with "unmistakable clarity."

The Supreme Court has repeatedly held that "in common usage, the term 'person' does not include the sovereign, [and] statutes employing the phrase are ordinarily con-

strued to exclude it." *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 604, 61 S.Ct. 742, 85 L.Ed. 1071 (1941)). This is particularly true "where the statute imposes a burden or limitation, as distinguished from conferring a benefit or advantage." *Wilson*, 442 U.S. at 667, 99 S.Ct. 2529. Much, however, depends on "the context, the subject matter, legislative history, and executive interpretation." *Id.*

The question, then, is whether the language or history of the False Claims Act shows that Congress clearly intended to hold states monetarily liable under § 3729. *See Hilton v. South Carolina Pub. Ry. Comm'n*, 502 U.S. 197, 206, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (stating that plain statement rule required not only by Eleventh Amendment but also by "canons of statutory interpretation"). Requiring Congress to make clear its intent is especially vital "where [as here] it is claimed that Congress has subjected the States to liability to which they had not been subject before." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

### 2. *Basis for the City Defendants' Motion*

The City Defendants stand in a slightly different posture, for unlike states, municipalities typically are presumed to be persons at common law. Municipalities are not presumed to be persons, however, when punitive or exemplary damages are at stake. The City Defendants move to dismiss on the ground that they are immune from the purportedly exemplary remedies required by the False Claims Act. They argue that because the statute imposes mandatory treble dam-

ages and significant fines for each false claim, its intent is to punish and deter fraud and its effect is to require extracompensatory awards from defendants. Therefore, they contend, the statute cannot be invoked against municipalities and their instrumentalities unless Congress has clearly evinced its intent to the contrary.

The doctrine of municipal immunity from punitive or exemplary damages [1] is well settled. In *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Supreme Court held that although a municipality, like a private corporation, is subject under common law to suit as if it were a natural person, "this understanding d[oes] not extend to the award of punitive or exemplary damages." *Id.* at 259–60, 101 S.Ct. 2748; *see also Genty v. Resolution Trust Corp.*, 937 F.2d 899, 910 (3d Cir. 1991) ("The measure of damages assessed against a municipality for its agents' tortious or criminal behavior has been 'the actual damages the plaintiff suffered, and no more.'") (quoting *Woodman v. Nottingham*, 49 N.H. 387, 394 (1870)). The Court observed that a municipality's immunity from punitive damages was "generally understood" in 1871, when the Civil Rights Act of 1871, 42 U.S.C. § 1983, was passed, and even earlier, citing cases dating back to the 1840's. *City of Newport*, 453 U.S. at 259, 263, 101 S.Ct. 2748. Hence, the doctrine of municipal immunity from exemplary or punitive damages was well recognized when the False Claims Act was first enacted in 1863.

In general, courts have viewed the award of exemplary damages against municipalities as "contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrong-

---

1. Courts often use the terms "punitive damages" and "exemplary damages" interchangeably even though they have slightly different meanings. *See, e.g., Harris v. County of Racine*, 512 F.Supp. 1273, 1281 (E.D.Wis.1981) ("[I]t would be an exercise in semantics ... [to] refer[ ] to multiple damages as 'augmented compensatory' damages, or some such euphemism. Clearly, multiple damages do retain elements of punishment and deterrence, even though multiple damages are not for all purposes equivalent to common law punitive damages."). "Exemplary damages" is the broader term; it refers to damages that ex-

ceed, or are over and above, actual damages designed to punish especially egregious conduct, to deter the general population by setting an example, or to vindicate public rights. "Punitive damages" and statutory multiple damages are subsets of exemplary damages awarded not to compensate for injuries but often specifically to punish wrongdoers. *See* Richard W. Murphy, *Superbifurcation: Making Room for State Prosecution in the Punitive Damages Process*, 76 N.C.L.Rev. 463, 475 (1998) (describing mandatory multiple damages awards as "close cousins of discretionary punitive damages").

doer was being chastised." *City of Newport,* 453 U.S. at 263, 101 S.Ct. 2748. While extraordinary damages are justified when imposed on individual wrongdoers, "[n]either reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." *Id.* at 267, 101 S.Ct. 2748. Because a municipality "can have no malice independent of the malice of its officials[,][d]amages awarded for *punitive* purposes ... are not sensibly assessed against the governmental entity itself." *Id.* The Supreme Court also expressed doubt that municipal officials "would be deterred from wrongdoing by the knowledge that large punitive awards could be assessed based on the wealth of their municipality." *Id.* at 268, 101 S.Ct. 2748.

The Court concluded that municipalities may not be held liable for exemplary damages unless Congress by statute plainly and specifically "abolish[es] the doctrine" to "expos[e] a municipality to punitive damages for the bad-faith actions of its officials." *Id.* at 263, 271, 101 S.Ct. 2748; *see Genty,* 937 F.2d at 914 ("Courts will not interpret statutes to overturn well-established common law principles unless Congress so authorizes.").

▮▮ Whether the doctrine of municipal immunity from exemplary or punitive damages has any bearing on the issue of the applicability of § 3729 of the False Claims Act to municipalities turns on whether the statute imposes damages that are exemplary or punitive in nature. I hold that it does, for two reasons.

First, the damages mandated by the False Claims Act clearly are exemplary damages because they are not limited to, but rather substantially exceed, the actual damages suffered by the United States. *See City of Newport,* 453 U.S. at 267, 101 S.Ct. 2748 (discussing exemplary damages as those "assessed over and above the amount necessary to compensate the injured party"). Treble damages and substantial fines are automatically imposed under the False Claims Act irrespective of whether the United States has actually suffered any injury. *See Rex Trailer Co. v. United States,* 350 U.S. 148, 153 n. 5, 76 S.Ct. 219, 100 L.Ed. 149 (1956); *Hydrolevel Corp. v. American Soc. of Mechanical Eng'rs,* 635 F.2d 118, 126 (2d Cir. 1980) (noting that False Claims Act remedies are "comparatively more punitive" than the antitrust laws because it includes not only multiple damages "but also fixed forfeitures for each violation"), *aff'd,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Scott v. Town of Duanesburg,* 176 A.D.2d 989, 574 N.Y.S.2d 833, 835 (3d Dep't 1991) ("[A]n award of treble damages against defendant is inappropriate since public funds are available only for the payment of damages actually suffered."); *cf. Genty,* 937 F.2d at 914 (emphasizing mandatory character of treble damages in concluding that RICO imposes exemplary damages).[2]

Second, although the False Claims Act is a "remedial" statute to the extent it seeks to recoup monetary losses suffered by the federal government through fraud, *see United States v. Bornstein,* 423 U.S. 303, 315, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 549, 63 S.Ct. 379, 87 L.Ed. 443 (1943), it also is punitive in nature.[3] Courts often have

---

**2.** The only statutory exception to the award of treble damages is an exceedingly narrow one: where a defendant has furnished "all information known to such person" to the United States within 30 days after "first obtain[ing] the information," has "fully cooperated with any Government investigation," at the time that the defendant furnished the United States with the information no criminal prosecution, civil action, or administrative action had yet been commenced, and the defendant did not have actual knowledge of an ongoing federal investigation, a court may impose no less than double damages. 31 U.S.C. § 3729. This limited exception thus does little to minimize the otherwise extracompensatory effect of the statute.

**3.** *Marcus* was decided when the False Claims Act provided only for double, as opposed to treble, damages and the *qui tam* relator was entitled to one half of the recovery. Thus, it was accurate then to conclude that "it cannot be said that there is any recovery in excess of actual loss of the government, since ... the government's half of the double damages is the amount of actual damages proved." 317 U.S. at 550, 317 U.S. 537. Likewise, the Supreme Court in *Bornstein* considered only the double damages provision as it then existed. Now that the Act provides for treble damages and a smaller recovery for the relator, the United States's share of the recovery has significantly increased and the False Claims Act has become more punitive in nature.

held in other contexts that the "very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct." *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *see, e.g., Genty,* 937 F.2d 899 (holding that treble damages against municipality was impermissible under RICO because statute does not expressly waive immunity against exemplary damages); *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1141 (5th Cir.1988) (same), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989); *Barnier v. Szentmiklosi,* 810 F.2d 594, 598 (6th Cir.1987) (treble damages authorized by state false arrest statute not permitted against municipality); *Tellis v. United States Fidelity & Guar. Co.,* 805 F.2d 741, 746 (7th Cir.1986) (treble damages under RICO unavailable against city defendant); *Massey v. Oklahoma City,* 643 F.Supp. 81 (W.D.Okla. 1986) (same).[4] Moreover, that the wrong sought to be addressed by the statute is a public wrong, that is, looting of the public treasury, as opposed to an individual wrong also suggests a quasi-punitive purpose. *See Hess,* 317 U.S. at 541 n. 5, 63 S.Ct. 379 (declaring that the statute "is intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side"); *see also* Pl.Mem. at 72 (conceding that the "United States is suing to vindicate public rights"). *See generally* John T. Boese, *Civil False Claims and Qui Tam Actions* at 1–8 (Supp.1998) (stating that *qui tam* statutes enable "private parties to initiate actions to redress public wrongs."); *cf. Genty,* 937 F.2d at 912 (finding that Congress's overall purpose in enacting treble damages provision of RICO to "redress serious harm to the nation as a whole" suggests punitive intent).

In this case, the United States seeks damages in the amount of three times $37,432,436 plus $10,000 for each alleged false claim submitted. Even after deducting the *qui tam* relator's share of the award were she to prove successful,[5] the United States clearly would still receive damages in excess of its injuries actually sustained—thus providing "a windfall to a fully compensated plaintiff." *City of Newport,* 453 U.S. at 267, 101 S.Ct. 2748. And from the City's perspective, liability would certainly require it to pay an extra-compensatory award. The exemplary damages sought against the City Defendants in this case therefore constitute precisely the sort of remedies against which the common law immunity was designed to protect.

■ The United States also argues that whatever immunity a municipality may enjoy with respect to exemplary damages, such immunity may not be invoked by states in suits brought by the federal government.[6] This argument, however, is unpersuasive. Although the Eleventh Amendment does not protect states from suit by the federal government, *see United States v. Mississippi,* 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965), the municipal immunity doctrine has its roots in policy considerations resulting in a general "judicial disinclination to award punitive damages" against municipalities, *see City of Newport,* 453 U.S. at 259–60, 101 S.Ct. 2748, rather than in the law of sovereign immunity. Indeed, the Eleventh Amendment played no role whatsoever in the creation or maintenance of this traditional

---

**4.** The United States cites *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), for the proposition that treble or even quadruple damages may be considered to be non-punitive. *Hess,* however, dealt only with the issue of when a civil penalty constitutes "punishment" within the meaning of the Double Jeopardy Clause of the Fifth Amendment. The *Hess* Court presumed that the multiple civil damages provided in the False Claims Act are "[p]unitive or exemplary damages" and held that such damages do not constitute a "criminal penalty" or cause the remedy to "lose the quality of a civil action." *Id.* at 550, 63 S.Ct. 379.

**5.** If the Government declines to intervene, the *qui tam* plaintiff receives 25–30% of any proceeds. Where, as here, the Government proceeds with an action brought by a "private person," the *qui tam* plaintiff's share of any recovery is limited to 15–25%. *See* 31 U.S.C. § 3730(d).

**6.** In a creative twist, the United States further argues that once inflation has been factored into the analysis, calculating treble damages under the new framework would actually amount to less money than double damages under the old one. It provides no caselaw, however, to support the proposition that inflation should be considered in determining whether a remedy is exemplary in nature.

immunity. In addition, the public policy reasons justifying municipal immunity from exemplary damages at common law apply with no less force to the federal government, and there is no support for the United States's position that municipalities may be brought within the purview of a statute by implication in instances where the United States, rather than a private party, is the plaintiff. If *City of Newport* means anything at all, it means that it is up to Congress to clearly signal its desire to subject municipalities to exemplary damages, regardless of the plaintiff.

Accordingly, I find that the remedies required by the False Claims Act constitute exemplary or punitive damages. Thus, the critical issue on the City Defendants' motion is whether Congress has clearly signalled its intent to abrogate this policy-based immunity and thereby expose municipalities to the exemplary remedies mandated by the Act.

### 3. *Congress's Intent*

█ Although the form of defendants' arguments varies somewhat, they both converge at a single inquiry: whether in enacting the original False Claims Act or any of its subsequent revisions, Congress clearly intended to hold states or municipalities liable as "persons" within the meaning of the Act.

Both the text of the statute and its legislative history demonstrate that the answer is a resounding "no." As explained below, Congress has never expressly subjected states or municipal entities to § 3729 of the Act or indicated its intent to do so.

#### a. *The Language of the Act*

I begin by analyzing the language of the Act itself. The liability provision, § 3729, provides that "any person" who violates any of its subsections "is liable" for, significant

fines and treble damages. While the terms "claim" and "knowing" are explicitly defined, the phrase "any person" as used in § 3729 is not. Thus, the statute does not clearly provide that states and municipalities are covered by § 3729.

The Civil Investigation Demands ("CID") provision, an entirely new section of the statute enacted in 1986, does contain a definition of the term "person." [7] It defines "person" to include "any State or political subdivision of a State." 31 U.S.C. § 3733(*l*)(4). This provision, borrowed from the Hart–Scott–Rodino Antitrust Improvement Act of 1976, sets forth a pretrial investigative procedure by which the Department of Justice can expeditiously obtain information necessary to decide whether grounds exist for initiating a false claims action. Section 3733 permits the Attorney General to serve civil investigative demands for information upon any "person."

The United States argues that by explicitly defining the term "person" in the CID provision in 1986, Congress sought to so define the term for the entire statute. Militating against such a broad reading, however, is the very language of the provision, which plainly states that the definitions contained in § 3733 apply "[f]or purposes of this section." § 3733(1). Thus, § 3733, by its own terms, does not purport to define the word "person" as used in other sections, even though at first glance it might appear anomalous to have slightly different definitions of the term in the same statute.[8] *See United States ex rel. Moore v. Univ. of Michigan,* 860 F.Supp. 400, 405 (E.D.Mich.1994) ("While this section does define 'persons' to include states, the definition is only for the purposes of § 3733.").

---

7. I am aware that a few courts have assumed that states may bring False Claims suits as relators. *See United States ex rel. Woodard v. Country View Care Ctr., Inc.,* 797 F.2d 888 (10th Cir. 1986); *United States ex rel. State of Wisconsin v. Dean,* 729 F.2d 1100 (1984); *United States ex rel. Hartigan v. Palumbo Bros., Inc.,* 797 F.Supp. 624 (N.D.Ill.1992). Because the term "private person" in § 3730 is also undefined and because the circumstances are different, these decisions are not helpful in construing § 3729.

8. When Congress desires to refer to states and their political subdivisions, it knows how to make that intention clear. Congress on many occasions has explicitly defined the phrase "person" to encompass states and political subdivisions when it has intended to do so. *See, e.g.,* 10 U.S.C. § 2507(f)(1); 15 U.S.C. § 77b(a)(2); 15 U.S.C. § 3002(1); 15 U.S.C. § 3301(26); 30 U.S.C. § 1522(b)(7); 33 U.S.C. § 1362(5); 33 U.S.C. § 1901(a)(8); 33 U.S.C. § 2701(27); 42 U.S.C. § 2014(s); 50 U.S.C. § 167(2).

The literal text of the statute, in short, does not plainly subject states and municipalities to False Claims Act liability.

I now turn to the legislative history of the Act to see whether, despite its language, Congress nevertheless clearly meant to bring municipal agencies and the several states within the ambit of § 3729.

#### b. *Legislative History*

##### i. *The Lincoln Law*

The legislative history of the original False Claims Act, popularly known as the "Informer's Act" or the "Lincoln Law," offers no support for plaintiff's reading of § 3729. The False Claims Act was enacted in 1863 at the height of the Civil War primarily to "combat rampant fraud in Civil War defense contracts." S.Rep. No. 345, 99th Cong., 2d Sess. (1863), *reprinted in* 1986 U.S.C.A.A.N. 5266. As the Supreme Court has explained, the statute

> was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before Congress painted a sordid picture of how the United States had been billed for non-existent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop the plundering of the public treasury.

*United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958).[9] The Act is broadly phrased to reach "any person" who violates its provisions, and the debates suggest that the Act was intended to be read generously to fulfill its goals. Nonetheless, "it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government." *Id.* at 599, 78 S.Ct. 950. While the legislative history surrounding passage of the original Act is

admittedly scant (emphasizing military procurement fraud), nothing in the available record suggests that Congress specifically intended to subject states or local governments to liability under the Act. Rather, the chief purpose of the Act was to address war fraud by private contractors.[10]  *See United States v. Bornstein,* 423 U.S. 303, 310, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (observing that statute was "aimed principally at ... frauds perpetrated by large contractors"); *Hess,* 317 U.S. at 551–52, 63 S.Ct. 379 (a Senator stated that "the government ought to have the privilege of coming upon him (a fraudulent contractor) or his estate and his heirs and recovery the money of which it is defrauded"); *United States ex rel. Weinberger v. State of Florida,* No. 77–0873 (N.D.Fla. Apr. 21, 1978), slip op. at 3 ("The legislative history makes it obvious that the congressional concern in passing the Act was primarily the prevention of frauds perpetrated upon the government by private contractors.... Nowhere in this history is there mention of the states or any intent to curb supposed false claims submitted by the states."). Hence, Congress in 1863 did not contemplate that states and cities would be defendants in False Claims Act suits, nor did it intend that they should be so subjected to False Claims Act liability.

##### ii. *The 1986 Amendments*

Although Congress has tinkered with the False Claims Act over the years, the 1986 amendments constitute the most "significant" and "substantial" changes in the Act's history. S.Rep. No. 345, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 5266 (the "Senate Report"). These amendments strengthened the Act by, among other things, dramatically increasing the mandatory civil remedies from double damages to treble damages and the fines from $2,000 to $5,000–$10,000 for each violation. There is, however, no support in the legislative record for the United States's contention that Con-

---

**9.** In 1863, a special committee of the House was "appointed to inquire into the facts and circumstances connected with contracts and agreements by or with the Government growing out of its operations in suppressing the rebellion." 131 Cong.Rec. 8778, 99th Cong., 1st Sess. (Apr. 22, 1985) (remarks of Rep. Fortney H. (Pete) Stark) (quoting 1863 report of special committee).

**10.** This conclusion is buttressed by the original language of the statute, which had spoken of a "person not in the military or naval forces of the United States."

gress in 1986 amended § 3729 to reach states and municipal entities.

A lone Senate Committee Report represents the most detailed piece of legislative history of the 1986 amendments, and provides the United States with the strongest support for its interpretation. In the end, however, the Report is insufficient evidence of congressional intent. The Report's "Background Statement," subtitled, "History of the False Claims Act and Court Interpretations," contains the following sentences:

> The False Claims Act reaches all parties who may submit false claims. The term 'person' is used in its broad sense to include partnerships, associations, and corporations—*United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir.1977); *United States v. National Wholesalers*, 236 F.2d 944 (9th Cir.1956)—as well as States and political subdivisions thereof. Cf. *Ohio v. Helvering*, 292 U.S. 360, 370, 54 S.Ct. 725, 78 L.Ed. 1307 (1934); *Georgia v. Evans*, 315 U.S. 792, 62 S.Ct. 796, 86 L.Ed. 1195 (1942); *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The False Claims Act is intended to reach all fraudulent attempts to cause the Government to pay out sums of money or to deliver property or services.

Senate Report, at 5273–74. While a committee report is often "considered a particularly good indicator of congressional intent," *Pierpoint v. Barnes*, 94 F.3d 813, 817 (2d Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1691, 137 L.Ed.2d 818 (1997), "[c]ommittee reports that contradict statutory language or purport to explicate the meaning or applicability of particular statutory language can short circuit the legislative process, leading to results never approved by Congress or the President." *Wallace v. Christensen*, 802 F.2d 1539, 1560 (9th Cir.1986) (en banc) (Kozinski, J., concurring).

In this case, the Report should be accorded little, if any, weight in the interpretation of § 3729. First, this passage is found in the descriptive section of the Report. As noted earlier, the section is entitled "Background" and "History ... and Court Interpretations." In addition, the sentences immediately preceding this passage show that the Report is discussing what the committee apparently believed to be the application of the Act "[i]n its present form." Senate Report, at 5273. Thus, read in context, this passage is largely descriptive in nature, purporting to describe the reach of the statute as it had existed prior to 1986.

The Report's description, however, is wrong. Although the passage cites cases purporting to stand for the proposition that states and their political subdivisions have been held liable as "persons" under the False Claims Act, none of those cases so held. In *Ohio v. Helvering*, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307 (1934), the Supreme Court ruled that states engaged in the sale of liquor were persons subject to a federal liquor tax. Similarly, in *Georgia v. Evans*, 315 U.S. 792, 62 S.Ct. 796, 86 L.Ed. 1195 (1942), the Court held that a state has standing to sue as a "person" under the Sherman Act. *Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held only that a municipality was a "person" within the meaning of § 1983 for the purposes of assessing compensatory damages.[11] Thus, while some state defendants have been sued under the False Claims Act since 1986, the description contained in this passage is mistaken: neither the Supreme Court nor any federal appellate court has squarely addressed the precise issue of whether states or municipalities are persons within the ambit of § 3729, and district court decisions have sharply differed on the matter. *Compare United States ex rel. Long v. SCS Bus. & Technical Institute*, 999 F.Supp. 78 (D.D.C.1998) (holding that states are persons within meaning of False Claims Act) *with United States ex rel. Zissler v. Regents of the Univ. of Minnesota*, 992 F.Supp. 1097 (D.Minn.1997) (dismissing claims against state on ground that it is not person subject to liability under False Claims Act).

---

11. In *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), decided after the 1986 amendments, the Supreme Court held that a state was not a "person" under § 1983.

Second, as discussed earlier, the text of the 1986 amendments does not support the proposition that Congress intended to alter the definition of "person" in § 3729.[12] As a mere expression of one legislative chamber's view as to how the phrase should be interpreted, the passage in the Report should be granted minimal, if any, weight in determining the meaning of § 3729. As the Supreme Court has warned, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Wright v. West*, 505 U.S. 277 295 n. 9, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). *See Pierce v. Underwood*, 487 U.S. 552, 566, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) ("[I]t is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means."); *Weinberger v. Rossi*, 456 U.S. 25, 35, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) ("[P]ost hoc statements of a congressional Committee are not entitled to much weight."); *Martin v. Bowen*, 670 F.Supp. 295, 298 (E.D.Cal.1987) ("A mere statement as to what a committee believes an earlier statute meant is 'obviously less weighty' " than enactment through bicameralism and presentment that expressly declares such an intent.); *see generally* 2A *Sutherland Statutory Construction* § 48.06, at 332–33 (Norman J. Singer ed., 5th ed.1992).

Third, the language in the Report has even less bearing here, as there is no evidence in the legislative history that the 1986 Congress sought to expand the term "person" in any way as used in § 3729. Neither the Report's discussion of the "purpose of the bill" nor its provision-by-provision analysis of the proposed changes evinces a desire to rework the phrase "person" in § 3729. In addition, the Congressional Budget Office, after analyzing the likely effects of the 1986 amendments, concluded that "[t]hese amendments are expected to involve no significant costs to the

federal government or to state or local governments." Senate Report, at 5302.

The conclusion that § 3729 should be read so as to exclude states and cities is bolstered by the fact that while Congress sought to "modernize" the Act's ability to combat fraud on the United States, there is no indication that fraud by states and municipalities, as opposed to fraud by individuals and corporations, played any role in Congress's consideration of the 1986 amendments. Describing the "need for legislation," the Senate Report notes that "[f]raud permeates generally all Government programs ranging from welfare and food stamps benefits, to multibillion dollar defense procurements, to crop subsidies and disaster relief programs," and singles out defense procurement fraud as one area that has received "heightened attention over the past few years." *Id.* at 5267. There is, however, no discussion of fraud by states and municipalities in particular. To the extent states and municipalities are considered at all, Congress sought only to make it easier for the United States to expose fraud committed *upon* states and local governments: the Senate subcommittee adopted a provision "allowing the Federal Government to sue under the False Claims Act to prosecute frauds perpetrated on certain grantees, States and other recipients of Federal financial assistance." *Id.* at 5280; *see id.* at 5286–88; *see also* § 3732(b) (conferring jurisdiction on federal courts to entertain state law claims "for recovery of funds *paid by a State or local government*") (emphasis added). Nor is there anything else in the legislative record to suggest that Congress intended to subject states and cities to monetary damages under the statute.

Congress, in short, did not intend to expand liability to states and municipalities in 1986. The passage contained in the Senate Report constitutes *no more than an incorrect*

---

**12.** Additional extrinsic evidence supporting this interpretation is The Program Fraud Civil Remedies Act, one of several laws passed in 1986 to combat fraud. For purposes of that statute, " 'person' means any individual, partnership, corporation, association, or private organization," implicitly excluding states and other political subdivisions. 31 § 3801(a)(6). *See* 2A *Sutherland Statutory Construction* § 47.07, at 152

(Norman J. Singer ed., 5th ed. 1992) ("A definition which declares what a term means ... excludes any meaning that is not stated."). The same section later separately employs the term "State" and "political subdivision of a State." Congress was well aware of how to clearly define the term "person" to either include or exclude states and municipalities.

observation in passing that the term "person" already included states and political subunits. *See United States ex rel. Zissler,* at 1112 ("[T]he view of the 99th Congress on the definition of the word 'person' in the [False Claims Act] sheds little light on the intentions of the enacting Congress over 120 years ago.").

### c. *Additional Considerations*

Two final factors should be considered: statutory consistency and equity in interpretation. These considerations, like the text of the statute and its history, militate in favor of a construction of § 3729 that excludes municipalities and the states.

A more narrow understanding of the term "person" in § 3729 will not do violence to the statute, and indeed, is consistent with the language and purposes of its other sections. While "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning ... the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 598, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).

Here, neither the text of the statute nor the legislative history demonstrates that Congress has ever actively considered whether to subject states and local governments to False Claims Act liability, and that it has unequivocally decided to do so. Moreover, the liability provision is substantively different in purpose from the CID provision: § 3729 imposes substantial civil liability on certain "persons," while § 3733 imposes more general duties to cooperate with ongoing Department of Justice investigations by complying with discovery requests. Accordingly, a somewhat bifurcated definition is consistent with Congress's clear intent in 1986 to enhance the federal government's investigative tools and to improve its ability to root out fraud *against* states and municipalities, as well as its relative (and long-standing) silence on the issue of whether to hold states and municipalities liable under the Act. Hence, while the United States suggests that it makes no sense to seek documents from third parties that are not the target of an investigation, such an interpretation is consistent with the broad scope of § 3733, as well as its history, permitting investigative demands to be served on any person who "may be" in possession of documentary material or information "relevant" to a false claims investigation, and not simply those who are the targets of investigation. *Cf.* H.Rep. No. 94-1343, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 2596, 2597 (stating that CID provisions of antitrust bill were intended to reach "'targets' and 'non-target' third parties with relevant information"). Indeed, the interpretation makes perfect sense given Congress's desire to address fraud perpetrated on states where federal funding is involved.

Although the Government urges an evolving construction of the term "person," there is a difference between faithfully interpreting the statute today to cover the types of fraud that would have been unimaginable in 1863, and amending the statute by judicial fiat to hold liable legal entities that have existed since the initial enactment of the statute but that have never been expressly brought within its purview. Before the extraordinary remedies of the Act may be invoked to reach the public treasuries of states and local governments, Congress must make it absolutely clear that the Act should be so applied.

Moreover, the equities of the statute weigh in favor of defendants' preferred interpretation. Either proffered construction arguably would be consistent with the text of the statute (if not entirely consistent with its history). Defendants would suffer obvious hardship, however, from an incorrect interpretation of an ambiguous statute, while the United States clearly has remedies available to it. It is an axiom that ambiguous statutes should be reasonably interpreted to avoid unnecessary hardship. *See Hesslein v. Hoey,* 91 F.2d 954, 956 (2d Cir.) ("A statute will be construed in such a way as to avoid unnecessary hardship when its meaning is uncertain.") (quoting *Burnet v. Guggenheim,* 288 U.S. 280, 285, 53 S.Ct. 369, 77 L.Ed. 748 (1933)), *cert. denied,* 302 U.S. 756, 58 S.Ct. 284, 82 L.Ed. 585 (1937); *Cartledge v. Miller,* 457 F.Supp. 1146, 1158 (S.D.N.Y.1978) ("general terms should be so limited in their appli-

cation as not to lead to injustice, oppression, or an absurd consequence"). Common law remedies are available to the United States, and it appears that in appropriate circumstances state and local officials could still be sued under the Act in their individual capacities. *See, e.g., Smith v. United States,* 287 F.2d 299 (5th Cir.1961) (False Claims Act suit brought against executive director of government housing project operated by municipal corporation). No suggestion has been made in this case that any state or local official personally profited from the alleged fraud. Rather, all the monies apparently were used for the foster care program.

Under all these circumstances, a prudent construction of § 3729 in this case vindicates the clear statement rule by requiring the lawmaking branches to make plain—Congress through bicameral decisionmaking and the President through presentment—their intent to expose states and municipalities to False Claims Act suits.

### d. *Summary*

For all of the reasons discussed above, I conclude that states are not subject to liability under § 3729.[13] It is not "plain to anyone reading [§ 3729] that it covers [the states]," *Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), nor is it obvious from examining the legislative record that states were to be exposed to False Claims Act liability. As a result, the term "person" as used in § 3729 is to be accorded its "ordinary and popularly assumed meaning," which excludes states. 2A *Sutherland Statutory Construction* § 47.07.

Similarly, I hold that § 3729 does not authorize suits against municipal entities. The provision itself does not expressly apply to municipalities, and nowhere in the legislative history is the topic of municipal liability addressed. As *City of Newport* makes clear, the fact that the term "person" often includes municipalities is insufficient to serve as an express abolition of the common law immunity against exemplary damages. In other words, the mere usage of the term "person" in a statute does not signify legislative intent to expose municipalities to exemplary damages. *See Genty,* 937 F.2d at 908–14 (general use of term "person" without evidence of abrogation insufficient to permit award of mandatory statutory treble damages against city). To deem the Senate Report sufficient evidence of congressional intent to subject cities to suit would be to permit the imposition of exemplary damages on municipalities by implication, which *City of Newport* expressly prohibits. *Cf.* 453 U.S. at 257, 101 S.Ct. 2748 ("The Court consistently has declined to construe the general language of [a statute] as automatically abolishing such traditional immunities by implication.").

Accordingly, defendants' motions to dismiss are granted in part and denied in part,[14] and Counts I through VIII of the amended complaint are dismissed.

### C. *The Cross–Motions for Summary Judgment*

Defendants move for summary judgment on all claims. Plaintiff, in turn, cross-moves for summary judgment.

---

**13.** Plaintiff cites various cases in which courts have held in False Claims actions that states may not invoke the Eleventh Amendment. *See, e.g., United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 39 F.3d 957, 962–63 (9th Cir.1994); *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Ctr.,* 961 F.2d 46, 48 (4th Cir. 1992). The general principle that sovereign immunity is unavailable as a defense in suits brought by the United States, however, does not answer the question of whether Congress, in enacting a particular statute, intended to hold states or municipalities liable as "persons."

The few courts that have permitted states to be sued under the False Claims Act either held only that sovereign immunity is unavailable as a defense to states, or assumed that these two inquiries are one and the same, or overemphasized the Senate Report. *See, e.g., United States ex rel.*

*Long,* 999 F.Supp. 78 (noting that Senate Report "sets out the broad reach of the statute"); *United States ex rel. Foulds v. Texas Tech. Univ.,* 980 F.Supp. 864, 871 (N.D.Tex.1997) (summarily rejecting argument that states are not persons under False Claims Act on ground that to give it credence would be to permit defendants to "assert sovereign immunity again, this time, bringing it through the back door").

**14.** To the extent defendants also move to dismiss the common law claims as inadequately pled, the motions are denied. The amended complaint fairly and reasonably apprises defendants of the factual underpinnings for plaintiff's claims and hence satisfies the requirements of Fed.R.Civ.P. 9(b) and 12(b)(6).

These motions are denied. To the extent defendants contend that the HHS instructions (and the 90% compliance standard) are nonbinding because they are not contained in the Social Security Act and were not promulgated as administrative rules, that argument is rejected. The Social Security Act plainly requires states to provide assurances that, among other things, they are "operating to the satisfaction of the Secretary . . . a case review system . . . for each child receiving foster care under the supervision of the State." 42 U.S.C. § 622(b)(9). The program instructions do not undermine the statute in any way, but instead facilitate compliance with the Social Security Act by giving notice of the standards required to obtain the Secretary's "satisfaction." The conditions therefore must be met. *See Maryland Dep't of Human Resources v. Sullivan,* 738 F.Supp. 555, 560 (D.D.C.1990) ("If [the state] fails to meet the percentage standards established in the program instruction, then [it] certainly fail[s] to meet the requirements of § 627").

Furthermore, numerous factual disputes preclude summary judgment for any party at this stage of the litigation. As to the claims of unjust enrichment, there is a genuine dispute as to whether defendants were entitled to the funding that they received. Defendants claim that they fully satisfied the statutory conditions for incentive funding and therefore were not unjustly enriched; plaintiff contends otherwise. Thus, summary judgment is inappropriate. *See Universal City Studios v. Nintendo Co.,* 797 F.2d 70, 79 (2d Cir.) (plaintiff must demonstrate that "the enrichment was at [its] expense, and that the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff"), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986).

It also remains to be seen whether incentive funds and foster care reimbursements were "wrongfully, erroneously, or illegally paid" by agents of the United States so as to warrant the imposition of liability on defendants for mistake of fact. *United States v. Electro–Therapeutics, Inc.,* 1996 WL 137687, at *3 (S.D.N.Y. Mar.27, 1996) (quoting *United States v. Wurts,* 303 U.S. 414, 416, 58 S.Ct. 637, 82 L.Ed. 932 (1938)). These claims, too, turn on the purely factual issue of whether defendants did all that was required under the law and therefore were entitled to the funds. Thus, summary judgment is unwarranted as to the claims of mistake of fact.

Finally, with respect to the fraud claims, there remain disputes as to several material issues, including whether the certifications sent by the State to HHS contained misrepresentations as to compliance and whether the Government reasonably relied on the alleged misrepresentations. *See United States v. Rivieccio,* 846 F.Supp. 1079, 1083 (E.D.N.Y.1994).

## *CONCLUSION*

Defendants' motions to dismiss are granted in part and denied in part. The parties' cross-motions for summary judgment are denied. The parties shall appear for a pretrial conference in Courtroom 11A at 500 Pearl Street on June 30, 1998 at 10:00 a.m.

SO ORDERED.