UNITED STATES of America ex. rel. William GARIBALDI and Carlos Samuel

v.

ORLEANS PARISH SCHOOL BOARD.

No. CIV. A. 96–0464.

United States District Court, E.D. Louisiana.

April 27, 1999.

As Amended June 4, 1999.

William Wessel, Raymond Robert Egan, III, Wessel & Associates, New Orleans, LA, for Plaintiffs.

Sam A. Leblanc, III, Edward Michael Morris, James G. Perdiago, Kenneth F. Tamplain, Jr., Adams & Reese, New Orleans, LA, for Defendant.

## ORDER AND REASONS

DUVAL, District Judge.

This qui tam action was filed by William Garibaldi and Carlos Samuel ("the relators") on behalf of the United States of America ("plaintiff") against the Orleans Parish School Board ("OPSB"). The case came before the court on a trial by jury, and the jury found in favor of the relators

and the United States (collectively, "plaintiffs"). Accordingly, the court entered judgment for the plaintiffs in the amount of approximately $31,000,000.

Before the court are several motions, including: (1) a Motion for Judgment as a Matter of Law, or, Alternatively, a New Trial, filed by defendant Orleans Parish School Board (Doc. # 192), (2) a Motion to Dismiss Plaintiff's Complaint for Lack of Subject Matter Jurisdiction, filed by defendant, OPSB (Doc. # 235); (3) a Motion to Alter or Amend the Judgment, filed by plaintiff, United States of America (Doc. # 191); (4) a Motion to Alter or Amend the Judgment, filed by the relators, William Garibaldi and Carlos Samuel (Doc. # 185); (5) Objections to Order Granting Motion for Extension of Time and Report and Recommendation, filed by defendant, OPSB (Doc. # 231); and (6) Objections to Proposed Findings, Conclusions, and Recommendation of Magistrate, filed by the relators (Doc. # 230). The court will address each motion in turn.

## I. DEFENDANT ORLEANS PARISH SCHOOL BOARD'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR ALTERNATIVELY, A NEW TRIAL

### A. APPLICABLE LEGAL STANDARDS

#### 1. STANDARD FOR JUDGMENT AS A MATTER OF LAW

Under Rule 50 of the Federal Rules of Civil Procedure, the court must determine whether there is sufficient evidence to support the jury's verdict and in so doing all evidentiary issues are to be resolved in favor of the successful party and that party is to be given the benefit of all reasonable inferences.

 As stated in the seminal case *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969), in considering a motion for judgment as a matter of law, the court should consider all of the evidence—not just that evidence which supports the non-

mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable persons could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded persons in exercise of impartial judgment might reach different conclusions, the motion should be denied. *See Branch v. Chevron Int'l Oil Co.*, 681 F.2d 426, 428–29 (5th Cir.1982).

#### 2. STANDARD FOR MOTION FOR NEW TRIAL

 The standard provided under Rule 59 of the Federal Rules of Civil Procedure to determine whether a new trial or remittitur is required is different from that of Rule 50. The rule does not specify what grounds are necessary to support such a decision; however, case law demonstrates that a new trial may be granted if the district court finds that the verdict is against the great weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course. *Smith v. Transworld Drilling*, 773 F.2d 610, 613 (5th Cir.1985). In making its determination, the lodestar is whether the verdict is against the great weight of the evidence or would result in the miscarriage of justice. Unlike a Rule 50 motion, there is no need to view the evidence in the light most favorable to the nonmoving party. Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2806 (2d. ed.1995).

### B. NO NEW EVIDENCE WAS PRESENTED AT TRIAL THAT WOULD MOVE THIS COURT TO RECONSIDER ITS RULING ON THE ISSUES RAISED BY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

 On September 22, 1998, this court issued a ruling denying the defendant's

Motion for Summary Judgment.[1] Of its many findings, the following are relevant to the arguments raised by OPSB in its post-trial motions:

- The court has subject matter jurisdiction over this *qui tam* action, because the information on which the action is based was not publicly disclosed prior to the relator's disclosure of it;

- Even if the information were publicly disclosed, the court still has subject matter jurisdiction over the claim, because the relators were the original source of the information;

- The relators plead the necessary elements, including *scienter*, to show fraud under the FCA; and

- The relators need not have actually filed their *qui tam* action before being terminated or suspended from their jobs in order to bring a retaliation claim under section 3730(h).

OPSB has reiterated the arguments it made in its Motion for Summary Judgment in its post-trial motions, and the court remains unpersuaded.[2] Having heard the evidence at trial, the court finds that it need not revisit the legal conclusions of its September 1998 Order and Reasons. The rest of OPSB's argument on these subjects is essentially an attempt to try its case before the judge instead of before the jury. The jury, and not the judge, is responsible for finding the facts in this case. This court finds that a reasonable jury could conclude that OPSB acted with fraudulent intent as defined by the FCA.

1. *United States of America ex. rel. William Garibaldi and Carlos Samuel v. Orleans Parish Sch. Bd.,* 21 F.Supp.2d 607 (E.D.La.1998).

2. OPSB does add one new legal argument: it claims that the court should have applied a "clear and convincing" standard rather than a "preponderance of the evidence" standard, despite its own failure to urge this standard at

## C. THE COURT DID NOT ABUSE ITS DISCRETION IN MAKING ITS EVIDENTIARY RULINGS

## 1. THE COURT PROPERLY ADMITTED DEFENDANT'S JUDICIAL ADMISSION AS TO THE NUMBER OF CLAIMS

Early on in this case, plaintiffs asked defendant, through a written interrogatory, to "state the total number of claims submitted to any federal or state agency for the special revenue fund and child nutrition fund for unemployment compensation and workers compensation for each quarter from January 1, 1986 through June 30, 1997 for the purpose of obtaining reimbursement."

In his answer to the interrogatory, Anthony Stolz, the OPSB Comptroller and the party representative at trial, provided computer print-outs of revenue postings for the time period requested, and answered that the "number of claims is equal to the number of posting designated with a 'Rev.' code." The plaintiffs used this information to create an exhibit that listed the number of receipts of federal funds for each year. *Plaintiff's Exhibit 62.* There were 1570 revenue postings in the exhibit. Mr. Stolz testified that he drew up this answer with his attorney. Defendant apparently later realized that, because the FCA penalizes each individual claim, the actual number of claims matters almost as much as the total monetary amount of those claims. At trial, defendant tried to exclude its prior interrogatory answer, and plaintiff moved for the court to consider the response a judicial admission. The court held that the response was a judicial admission under *White v. ARCO/Polymers, Inc.,* 720 F.2d 1391 (5th Cir.1983)

trial and its own admission that the Fifth Circuit has applied a preponderance of the evidence standard in FCA cases. *United States v. Thomas,* 709 F.2d 968, 971–72 (5th Cir.1983). The court finds that the proper standard is the "preponderance of the evidence" standard and that the court applied it correctly.

(factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them), *citing Myers v. Manchester Insurance & Indemnity Co.*, 572 F.2d 134 (5th Cir.1978). OPSB argues that this holding was an abuse of discretion, because the claims to which it admitted were not claims under the definition of "claim" in the False Claims Act. The court disagrees.

 Only deliberate, clear, and unequivocal statements can be judicial admissions. *Matter of Corland Corp.*, 967 F.2d 1069, 1074 (5th Cir.1992), (citing *Backar v. Western States Producing Co.*, 547 F.2d 876, 880 n. 4 (5th Cir.1977)). OPSB cites *Backar* for the principle that if the person making the admission is unaware that he is admitting liability, the admission is not a "judicial admission," and argues that, here, Stolz was unaware that he was admitting liability. The court finds *Backar* inapplicable. Stolz's admission was not the uninformed statement of a low-level employee. As the Controller of OPSB, Stolz drafted the admission with the help of his attorney. Furthermore, the statement does not admit liability: Stolz did not state that OPSB made 1570 "false claims," just that it made 1570 "claims" for worker's compensation and unemployment compensation costs. If the court were to allow the defendant to equivocate on its answers to interrogatories, the doctrine of judicial admissions would lose its meaning and effectiveness.

 Defendants further argue that the response of Mr. Stolz could not be properly considered by the jury, as the substance of the response contradicts the definition of "claim" in the statute and in the federal regulations. The False Claims Act defines the term "claim" as follows:

> For the purpose of this section, a "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government pro-vides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. § 31 U.S.C. § 3729(c).

In other words, the School Board made a "claim" every time it requested money from the government. It is the number of applications for funds, and not the number of coded items on each application, or the number of invoices generated by the applications, or the number of contracts the applications represent, that determines the number of claims made. *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (where subcontractor who made three shipments of falsely branded electron tubes to prime contractor which caused prime contractor to submit false claims to the U.S. government, using 35 separate invoices, three false claims were made); *Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d 17, 23 (1977) (contractor who submitted five monthly billings to the government in which eleven invoices were enclosed made five false claims, one for each occasion on which the contractor made a request for payment); *United States v. Woodbury*, 359 F.2d 370, 378 (9th Cir.1966) (Ten false applications for reimbursement included many more false invoices, but court assessed statutory penalty based on ten claims).

 The court recognizes that the FCA's method of determining the number of claims can seem somewhat arbitrary. Here, the *scienter* may have been established, or renewed, each time the School Board decided to renew its contract with UCCS, or when it decided to handle its worker's compensation program internally, knowing that this would create a surplus and that the surplus would be used solely to help the general fund. However, under the FCA, the jury was obligated to assess the number of claims using the number of times the School Board made claims, and not based on the number of times the

School Board decided to make these claims. In a similar case, the United States brought an FCA action against a builder of subsidized housing. The district court assessed 76 forfeitures, one for each monthly voucher. The defendant argued that the number of forfeitures should be limited to the number of acts he committed which caused false claims to be filed. Asserting that he did but one act, inflating construction costs, that caused false claims to be filed, the builder concluded that he was liable for only one forfeiture. The court held that because the builder knowingly caused a specific number of false claims to be filed, he was liable for that number of forfeitures. *United States v. Ehrlich*, 643 F.2d 634 (9th Cir.1981). Here, the School Board is liable, not for the number of contracts it entered into with UCCS, or the number of times it agreed to participate in the three-tiered rate system, or the number of times it decided to implement an internal worker's compensation plan, but the number of times it made claims to the government that were false.

■■■ On the other hand, OPSB is not liable for each and every code on its requests to the government. For example, OPSB often filed requests for reimbursement that included codes for both worker's compensation and unemployment compensation on the same page. OPSB is liable for only one false claim per application, even if more than one account was listed on the page. As one court considering the issue explained:

> The government contends that fairness or uniformity concerns support treating each CPT code as a separate claim, arguing that "[t]o count woodenly the number of HCFA 1500 forms submitted by the Krizeks would cede to medical practitioners full authority to control exposure to [the FCA] simply by structuring their billings in a particular manner." Precisely so. It is conduct of the medical practitioner, not the disposition of the claims by the government, that

creates FCA liability. *United States v. Krizek*, 111 F.3d 934, 940 (D.C.Cir.1997). The FCA punishes those who defraud the government not by the number of contracts or coded items they submit, but by the number of actual fraudulent claims made. While this system may create somewhat arbitrary results, it is the scheme mandated by the FCA, and the court did not abuse its discretion in instructing the jury to apply the statute as written.

■■■ OPSB further argues that the jury improperly reached its determination that the 1570 claims were false because OPSB did not make each claim with the knowledge that it was false. OPSB misunderstands the reasoning behind the FCA. The FCA does not require that the low-level accounting employee who processes accounts to have the requisite *scienter* when each claim is processed. It requires the entity, the OPSB, to have the requisite intent. If the OPSB knew that its actions would result in a number of false claims, the FCA penalizes it for each false claim. *See United States v. Ehrlich*, 643 F.2d 634 (9th Cir.1981), *supra* (claimant liable for each false claim filed, even where one act of inflating construction costs created all false claims).

## 2. THE COURT PROPERLY EXCLUDED THE TESTIMONY OF DEFENDANT'S EXPERTS

OPSB claims that the court abused its discretion in excluding the expert testimony of four accountants: Albert J. Richard, Alcede Tervalon, Frank T. McKune, and Christopher Polischuck. The court struck these witnesses because defendant never submitted expert reports for any of them. OPSB claims that the November 7, 1995 "External Auditor's Report" constituted the expert report of all four accountants, and that its failure to formally designate it as an "expert report" was a mere formality that did not unfairly prejudice the plaintiffs. Mr. McKune and Mr. Polischuck were not even signatories to this report,

and OPSB never designated it as an expert report.

Messrs. Polischuck and McKune were designated only as expert witnesses, not as fact witnesses, and because OPSB never submitted an expert report for either of them, the court struck their testimony entirely. Messrs. Richard and Tervalon, however, were listed as both expert and fact witnesses. In an attempt to ensure that defendant, despite its laxity toward the rules and deadlines of this court, was able to put on its case, this court allowed defendant to call Richard and Tervalon as fact witnesses, and to question them about the 1995 report.

Defendant now claims that this court abused its discretion in striking Poleschuck and McKune and in limiting Richard and Tervalon's testimony to facts, because this exclusion of expert testimony "struck at the heart of the case." Specifically, defendant argues that, had it been allowed to call its expert witnesses, they would have testified that OMB Circular A–87 did not require that an actuarial report be conducted every year, as claimed by plaintiffs' experts. Defendant is correct in its observation that expert testimony was important in this trial. For this reason, counsel for defendant should have followed the rules of this court, and submitted expert reports, or designated documents revealed in discovery as expert reports, by the deadline set forth by this court. Defendant was fully aware of the deadline for submission of expert reports, because defendant moved on June 10, 1998 for an extension of the deadline, which the court granted (Doc. # 53). Defendant, however, then chose to ignore the new deadline. The court takes its pre-trial deadlines seriously. These deadlines are imposed so that each party will be treated fairly. The court is not responsible for defendant's lack of care in adhering to the deadlines ordered by the court.

 That said, the court notes that it might reconsider its decision if defendant could show it had suffered unfair prejudice

as a result of the court's action. Defendant, however, has failed to show that it was prejudiced in any way. The court allowed Mr. Tervalon and Mr. Richard to testify as fact witnesses about the November 1995 auditor's report that they authored, and about any opinions they rendered in that report. *The defense chose not to put Mr. Tervalon on the stand.* The court is astonished that defendant did not take the opportunity to question Mr. Tervalon as a fact witness, when, as a co-author of the report, Tervalon could have testified to the details of the report, the factual inquiry behind it, and the reasons behind its conclusions. Defendant certainly had the opportunity to question Mr. Tervalon about whether it was his understanding, when he wrote the report, that OMB Circular A–87 did not require yearly actuarial reports.

Contrary to the allegations in defendant's post-trial motion, Mr. Richard *was* allowed to testify as to whether OMB Circular A–87 required yearly reports. The court was remarkably lenient with Mr. Richard's "fact" testimony, allowing him much latitude to give opinions about his report even though he had not been certified as an expert witness. Defendant suffered no prejudice from its failure to follow this court's rules and certify Richard as an expert, because the court assisted it by construing "fact" testimony very loosely.

Defendants contend that the court should have continued the trial rather than refusing to allow the defense's expert witnesses to testify. A continuance would have been grossly unfair to the plaintiffs, especially since it would have been caused solely by a lack of care and attention paid by defendant to deadlines and court rules.

## D. THE RELATORS DID NOT EXERCISE THEIR PEREMPTORY CHALLENGES IN VIOLATION OF *BATSON*

 A party to a civil suit may challenge another party's use of a peremptory

strike that excludes a prospective juror on the basis of that juror's race. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). A party may challenge another's peremptory strike regardless of the race of the challenging party since the objection asserts the juror's equal protection rights. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

The Fifth Circuit has developed a three-step process for evaluating *Batson* claims. First, the complaining party must make a prima facie showing that opposing counsel has exercised a peremptory challenge on the basis of race. Once this showing has been made, the burden shifts to the striking party to articulate a race-neutral explanation for the strike. Thereafter, the court must determine whether the *Batson* claimant has proven purposeful discrimination. *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir.1993). The district court has the discretion to fashion the procedure necessary to evaluate counsel's race-neutral explanation. *United States v. Clemons*, 941 F.2d 321 (5th Cir.1991). The trial court's decision on the ultimate question of discriminatory intent is a finding of fact usually accorded great deference on appeal because of the inherent credibility assessment. *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality) (citing *Batson* ); *United States v. Valley*, 928 F.2d 130 (5th Cir.1991) (citing *United States v. Moreno*, 878 F.2d 817 (5th Cir.), *cert. denied*, 493 U.S. 979, 110 S.Ct. 508, 107 L.Ed.2d 510 (1989)).

In *Batson*, the Supreme Court held that determining whether a prima facie case of discrimination has been established requires consideration of all relevant circumstances, including whether there has been a pattern of strikes against members of a particular race. 106 S.Ct. at 1722–23. Here, defendants claim that plaintiffs used their peremptory challenges to exclude African–American residents of Orleans Parish. *Batson* does not prohibit peremptory challenges based on residency in a particular county or city, unless the peremptory challenges are a proxy for race. Orleans Parish has a diverse citizenship, and residency in Orleans Parish is not a proxy for race. In this case, which required jurors to consider ruling against the Orleans Parish School Board, and thus potentially influencing the taxes on residents of Orleans Parish, residents of Orleans Parish might well have been excluded for permissible and strategically prudent reasons. The court finds that defendant cannot make out a prima facie case of discrimination based upon plaintiffs' decision to strike residents of Orleans Parish.

Defendant has, however, made out a prima facie case of discrimination based upon plaintiffs' striking of black jurors in general. Plaintiffs used their peremptory challenges to strike Toyoka Rowel, Dora Matthews, and Arthemise Williams, all black women, during voir dire. The dearth of black women on the final jury was not entirely the result of plaintiffs' peremptory strikes: the court excluded Sethany Johnson, a black resident of Orleans Parish, because of her educational commitments, and Lois Johnson, a black juror from Orleans Parish, was seated but then excused by the court because she thought she knew one of the relators, Carlos Samuel. However, plaintiffs clearly exhibited a pattern of striking black women from the jury, and the final jury panel consisted of eleven whites and one black man.

Once counsel has offered a race-neutral explanation and the trial court has ruled on the ultimate issue of intentional discrimination, the court considers only the sufficiency of the race-neutral reasons articulated by counsel. *Hernandez v. New York*, 111 S.Ct. at 1866. A race-neutral explanation is one "based upon something other than the race of the juror."

*Clemons,* 941 F.2d at 324–25 (citing *Hernandez* ). Here, the plaintiffs offer strong reasons for excluding two of the jurors: Dora Matthews was excluded because she was an employee of the Orleans Parish School Board, and Arthemise Williams was excluded because she was a friend of Everett Williams, who was Superintendent of OPSB during some of the years under investigation. The court looks more critically at the plaintiffs' striking of Toyoka Rowel, a community college student whom the plaintiffs chose to strike because of her "inexperience and youth." The Fifth Circuit, however, has previously found age and appearance to be legitimate reasons for the exercise of peremptory challenges. An explanation "need not be quantifiable" provided that the intent is not race-based. *Clemons,* 941 F.2d at 325. This circuit has also found "disinterested demeanor" and "inattentiveness" to be valid, race-neutral reasons for peremptory strikes. *See United States v. Roberts,* 913 F.2d 211 (5th Cir.1990), *cert. denied,* 500 U.S. 955, 111 S.Ct. 2264, 114 L.Ed.2d 716 (1991); *see also United States v. Melton,* 883 F.2d 336 (5th Cir.1989); *see also United States v. Lance,* 853 F.2d 1177 (5th Cir.1988). The court finds that plaintiffs' have met their burden to articulate race-neutral reasons for their strikes, as required by *Batson.*

### E. THE FALSE CLAIMS ACT APPLIES TO PUBLIC ENTITIES

■ The False Claims Act provides that "any person" who causes false claims and reports to be presented to the United States for payment, or who forms a conspiracy to have false claims paid by the United States, will be liable for treble damages and civil penalties. 31 U.S.C. § 3729. Generally, a municipality is not deemed to be a "person" when punitive and exemplary damages are at stake. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). However, if a statute makes clear that such an interpretation is contemplated, then such damages are permissible.

■ Here, the legislative history of the False Claims Act as amended in 1986 makes clear that Congress intended states and municipalities to be included in the definition of "person":

> [t]he False Claims Act reaches all parties who may submit false claims. The term "person" is used in its broadest sense to include partnerships, associations, and corporations ... as well as States and political subdivisions thereof. S.Rep. No. 99–345, at 8 (citations omitted).

The Fifth Circuit has not ruled on the question of whether the term "person" includes states or municipalities. *See, e.g., United States ex rel. Foulds v. Texas Tech University,* 171 F.3d 279 (5th Cir.1999) (declining to address the "person" issue). The Eighth Circuit has held that the False Claims Act contemplates claims against states, in part because of the use of the word "person" to include states throughout different provisions of the Act. *United States of America ex. rel. Zissler v. Regents of the University of Minnesota,* 154 F.3d 870, 875 (8th Cir.1998); *see also United States ex rel. Stevens v. Vermont Agency of Natural Resources,* 162 F.3d 195 (2d Cir.1998).[3] *Zissler* noted that

---

**3.** One district court came to a contradictory conclusion in which it held that a state or municipality could not be sued under the False Claims Act. *United States ex rel. Graber v. City of New York,* 8 F.Supp.2d 343 (S.D.N.Y.1998). The court held that because municipalities cannot be sued for punitive damages, the FCA cannot apply to municipalities. The Supreme Court, however, has held that damages under the FCA are not punitive. *United States v. Halper,* 490 U.S. 435, 446, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (damages under the FCA are not punitive in double jeopardy context, but remedial). While holding municipalities liable for punitive damages is contrary to public policy, *see City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), *McGary v. City of Lafayette,* 12 Rob. 668, 677 (La.1846), the False Claims Act was intended to be remedial, not punitive. Moreover, *Graber* may have been effectively overruled by *Stevens.*

states themselves have filed *qui tam* actions, even though the Act authorizes only "private persons" to enforce it. Consequently, if states believe they are "private persons" when bringing an FCA action, they should also be deemed "persons" when they are sued. *Zissler* also notes that section 3733(1)(4) of the FCA includes states in its definition of "person." *Id.* "Person," then, should be read to include states, and subdivisions thereof, throughout the Act.[4]

### F. THE FALSE CLAIMS ACT DOES NOT VIOLATE THE UNITED STATES CONSTITUTION

#### 1. THE FALSE CLAIMS ACT DOES NOT VIOLATE THE TENTH AMENDMENT

Under the Tenth Amendment, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amendment X. In the leading case interpreting the Tenth Amendment, the Supreme Court outlined a test for determining when the federal government impermissibly encroaches on state sovereignty. *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). *Printz* held that provisions of the Brady Act which temporarily required the Chief Law Enforcement Officer of each local jurisdiction to conduct background checks on prospective handgun purchases violated the Tenth Amendment because the provisions compelled the states to enact a federal law. This ruling turned on the coercive nature of the government's behavior. *Id.* at 2383 ("[t]he Federal Government may not compel the States to enact or administer a federal regulatory program"). The *Printz* court declined to

hold unconstitutional those provisions of federal regulations which require states to participate in specific activities once they have voluntarily participated in a general scheme.

 Here, defendant subjected itself to regulation by the federal government when it accepted federal funds. No coercion exists where the United States subjects states to the same conditions for federal funding as other grant recipients. *Zissler,* 154 F.3d 870 (8th Cir.1998). As the *Zissler* court explained:

> States may avoid these requirements simply by declining to apply for and to accept these funds. But if they take the King's shilling, they take it *cum onere* ... Here [under the FCA], the only cooperation asked of States is honesty, a mild requirement in light of the fact that the Tenth Amendment allows even the indirect achievement of objectives which Congress is not empowered to achieve directly, through conditional federal funding ... a False Claims Act action against a State falls within the usual constitutional balance between the States and the Federal Government.

The United State's requirement that recipients of federal funds refrain from defrauding the government does not violate the Tenth Amendment.

#### 2. THE OPSB IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY

Under the Eleventh Amendment to the United States Constitution:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or

---

4. The District of Columbia Circuit recently held, contrary to *Zissler* and *Stevens,* that states are not "persons" within the meaning of the act. *United States ex rel. Long v. SCS Business & Technical Institute Inc.,* No. 98–5133, 4–2–99. The court, however, did not reach the question of whether municipalities

were also non-persons under the act, and, as the court's analysis was based in large part on its concern the FCA might fail under the Eleventh Amendment if "persons" were read to include states, the analysis is not applicable here, where no such concerns exist. *See Section I(F)(2), infra.*

by Citizens or Subjects of any Foreign State. U.S. Const. amend. XI.

A citizen, then, cannot sue a state in federal court. OPSB argues that it is entitled to Eleventh Amendment immunity because the relators, and not the United States, are the real parties in interest, and are therefore "citizens," and because the OPSB is an arm of the state.

### a. Are the claims brought by "citizens"?

The Fifth Circuit has held that the Eleventh Amendment bars a *qui tam* relator's claim arising under 31 U.S.C. § 3729 *et seq.* against states and state agencies, when the United States does not intervene. *United States ex rel. Foulds v. Texas Tech University,* 171 F.3d 279 (5th Cir.1999). The court reasoned that, where the United States declines to intervene, "'it is as plain as the sun'' that the "suit was not commenced by the United States and that the United States has not intervened to prosecute" the case. *Id.* at 285–88. The court also held that a *qui tam* relator's retaliatory discharge claim under 31 U.S.C. § 3730(h) was likewise barred. *Id.*

Here, the suit was brought by relators William Garibaldi and Carlos Samuel on behalf of the United States. The United States chose not to intervene in the action, and the relators nonetheless succeeded on both their retaliation claims and their False Claims Act claims. Under *Foulds,* the Eleventh Amendment clearly would have barred relators from bringing this suit if the entity they were suing was the state, because the relators are "citizens" of a state.

### b. Is the Orleans Parish School Board the "state"?

The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations. *Edelman v. Jordan,* 415 U.S. 651, 667 n. 12, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *see also Lincoln County v. Lun-*

*ing,* 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Moor v. County of Alameda,* 411 U.S. 693, 717–721, 93 S.Ct. 1785, 1799–1801, 36 L.Ed.2d 596 (1973). The court must therefore determine whether the OPSB is more like a state or more like a county.

The Supreme Court has held that the issue of whether a political subdivision it to be treated as an "arm of the State" partaking of the State's Eleventh Amendment immunity or instead as a political subdivision or municipal corporation to which Eleventh Amendment immunity does not extend depends, "at least, in part, upon the nature of the entity created by state law." *Mt. Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). In *Mt. Healthy,* the Court determined that the Mt. Healthy Department of Education was not entitled to Eleventh Amendment immunity. Although the school board was subject to some guidance from the State Board of Education, and received a significant amount of money from the State, the school boards had extensive powers to issue bonds, and to levy taxes within certain restrictions of state law. 429 U.S. at 280, 97 S.Ct. at 573. The Court therefore concluded that "a local school board such as petitioner is more like a county or city than it is like an arm of the State." *Id.*

In *Minton v. St. Bernard Parish School Board,* 803 F.2d 129 (5th Cir.1986), the Fifth Circuit set out a six-factor test for determining whether a political subdivision is an "arm of the state" or merely a local independent entity:

(1) whether state statutes and case law characterize the agency as an arm of the state;

(2) the source of funds for the entity;

(3) the degree of local autonomy the entity enjoys;

(4) whether the entity is concerned primarily with local, as opposed to statewide, problems;

561

(5) whether the entity has authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

*Id.*

The *Minton* court determined that, based on these factors, parish school boards are "local independent agents not shielded by the state's Eleventh Amendment immunity." *Id.* With respect to prong one of the test, the court held that, while Louisiana courts had referred to school boards as "agencies" of the state, that this characterization did not amount to an assertion that the boards were arms of the state within the meaning of the Eleventh Amendment. The court determined that the other five factors clearly indicated that the school board was not an arm of the state: the school board had an ability to generate funds for the operation of the school district through local ad valorem taxation, the board exercised discretion in performing its functions, the board's nature was innately local, the board had authority to sue or be sued in its own name, and the board could hold, use, or sell property as it determined necessary to fulfill its obligation to the public. *Id.* The court concluded that, based on these findings, Louisiana school boards are not "mere arms of the state" and that monetary judgments against them would not "represent indirect impositions on the state treasury interfering with the state's fiscal autonomy." *Id.* The St. Bernard Parish School Board was therefore not entitled to Eleventh Amendment immunity. *Id. See also Smith v. Concordia Parish School Board,* 387 F.Supp. 887, 891 (W.D.La.1975) (school boards and similar autonomous political subdivisions are not the alter ego of the State, but are distinct from the standpoint of sovereign immunity); *Morgan Dallas Corp. v. Orleans Parish School Board,* 302 F.Supp. 1208 (E.D.La., 1969); *Board of C.P. of New Orleans v. Splendour S & E Co.,* 273 So.2d 19 (La.1973); *Orleans Parish School Board v. Williams,* 300 So.2d 848 (La.App. 1974).

■ Defendant urges that in the thirteen years since the Fifth Circuit decided *Minton,* the nature of school boards in Louisiana has changed. Specifically, OPSB argues that it now receives 60% of its funding from state sources. The *Minton* court did not set out a standard for determining how much of a school board's funding had to be locally generated. The *Minton* test requires the court consider whether the school board can generate money through local property taxes, not whether the revenue so generated is sufficient to fund the quality of education the school board deems necessary.

■ The other factors in the analysis mandated by *Minton* similarly remain unchanged. Louisiana school boards, including this defendant, are bodies corporate with the power to sue and be sued (L.S.A. R.S. 17:51), to make contracts (L.S.A. R.S. 17:81, 17:83), to purchase and hold property (L.S.A. R.S. 17:81), and to sell property (L.S.A. R.S. 17.87.6). The members of the board are elected from districts within the Parish. OPSB argues that because state law curtails some activities of school board members, such as prohibiting them from endorsing other school board candidates, and setting out tenure requirements for teachers and employees, that the school board has somehow become "the state" for Eleventh Amendment purposes. But the state has always regulated political subdivisions such as local school boards in many ways. This fact does not make the school boards mere creatures of the state. The court finds that school boards in Louisiana have not so changed since *Minton* that their Eleventh Amendment status has changed. The Orleans Parish School Board is not entitled to immunity from suit. under the Eleventh Amendment.

## G. A PART OF THE JURY AWARD WAS INADEQUATELY SUPPORTED

OPSB argues that the jury award was inadequately supported by the evidence in two ways. First, it argues that the $4.6

million unemployment compensation award could only be based upon "speculation and guesswork." Second, it argues that the $3 million worker's compensation award was incorrect because the evidence it was based on was inaccurately calculated.

### 1. STANDARD FOR REMITTITUR

A Rule 59 motion, as has been filed here, is an appropriate means to challenge the size of a verdict. *Dunn v. Consolidated Rail Corp.*, 890 F.Supp. 1262 (M.D.La.1995). A jury's assessment of damages is entitled to great deference by a reviewing court and is not to be disturbed unless it is entirely disproportionate to the injury sustained. *Id.* The extent of distortion that warrants intervention is an award so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion or other improper motive, or so clearly exceeding the amount that any reasonable person could feel the claimant is entitled to recover. *Id.*, (citing *In Re Air Crash Disaster Near New Orleans, La.*, 767 F.2d 1151, 1155 (5th Cir. 1985)). Where the evidence at trial shows a range of possible damages, the jury "enjoys substantial discretion in awarding damages within the range shown by the evidence." *Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir. 1990), *see also City of Houston v. Harris County Outdoor Advertising Ass'n*, 879 S.W.2d 322, 334 (Tex.App.1994), *cert. denied*, 516 U.S. 822, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995) ("the trier of fact has the discretion to award damages within the range of the evidence presented at trial"). With this standard in mind, the court turns to the issues at hand.

### 2. UNEMPLOYMENT COMPENSATION AWARD

The jury calculated the United States' damages at $4.6 million dollars for amounts overcharged to the special revenue and child nutrition funds for unemployment compensation insurance. At tri-al, the jury was presented with several conflicting versions of how much was overcharged to these funds. For example, Plaintiff's Exhibit 45–C showed a total of $4,292,968 charged to the Special Revenue Programs for the years 1988–1994. Plaintiff's Exhibit 45–D showed total of $1,176,-647 overcharged to the Food Service Programs for the years 1987 through 1994. These numbers were obtained assuming that the special revenue programs made up an average of 8.4% of the total salaries for those years, and that the child nutrition programs made up an average of 4.3%. If the jurors were to have added these figures together, they would have come to a total of $5,469,615 overcharged for those years. There would have been two obvious problems with this figure, however. First, the figure would not have included special revenue charges for the year 1987, as these were not included in the calculations. And second, the average percentages of total salaries were merely averages, and not accurate year by year.

The jurors could have used this figure and added it to the figures shown in Plaintiff's Exhibits 40–A and 40–B, which showed the amounts overcharged by the school board for unemployment compensation for the years 1995–1997. Exhibit 40–A shows overcharges to the special revenue programs of $1,042,508, and Exhibit 40–B shows overcharges to the child nutrition programs of $223,821. Together, then, overcharges to the federal programs for the years 1995–1997 totaled $1,266,329. If the jury had added this figure to the $5,469,615 overcharged during the other years according to Plaintiff's Exhibits 45C and 45D, it would have come up with a final figure of $6,735,944.

A second method the jurors could have used in arriving at their verdict was to look to the figures in Plaintiff's Exhibit 45–E, which purports to be a composite of all of Exhibit 45. The total difference listed by plaintiffs on that piece of evidence is $4,854,388, a number which includes $1,016,826 overcharged to the food service

fund and $3,837,562 overcharged to the special revenue funds. Apparently, the conclusions reached on this table differ from those on the other components of Exhibit 45 because this table calculates the salary percentage year by year rather than by using an average for the entire period of years, and because this table included special revenue charges for the year 1987. If the jury had chosen to use this figure and added the $1,266,329 from Exhibits 40A and 40B, it would have come up with a final figure of $6,120,717.

A third document shown to the jury was the United States Department of Education Office of the Inspector General Final Audit Report, completed in January of 1998 (Plaintiff's Exhibit 30). This report included a table, showing the "amount actually charged," "reasonable charges," and "excess amount charged to the Education Department" for each year 1992 through 1996. The report concluded that the OPSB overcharged the Department of Education by $2,265,212 in unemployment compensation costs from 1992 through 1996. The report does not cover the years 1987 through 1991. OPSB has alleged that the jury merely multiplied this number by two and rounded it (as the number covered five out often of the years in question). The number doubled would be $4,530,424. While this calculation may have factored into the jury deliberations, the court notes that 4,530,424 rounds to 4.5 million, not 4.6 million.

The jury, then, had at least three figures to choose from in calculating its award, once it had determined that false claims were made and that these claims were made with the necessary level of *scienter*. One set of exhibits showed losses of $6,735,944, another showed losses of $6,120,717, and yet another showed losses of $2,265,212 for only half of the years in question. An award of $4.6 million is clearly within a reasonable range based upon the evidence presented by the jury. It is possible that the jury felt that the government's lower figure was more reli-

able than those prepared by the relators themselves. The court need not speculate as to why the jury chose the figure of $4.6 million, as the award was clearly "within the range shown by the evidence" and not "entirely disproportionate to the injury sustained." *Neiman–Marcus*, 919 F.2d at 372 (5th Cir.1990), *Dunn v. Consolidated Rail Corp.*, 890 F.Supp. at 1287 (M.D.La. 1995).

### 3. WORKER'S COMPENSATION

#### a. Arithmetic Error

The jury awarded plaintiffs $3 million in worker's compensation overcharges. At trial, plaintiffs presented a chart (Exhibit 30), which outlined the overcharges for each year and providing a total of the overcharges. The total shown by plaintiff's chart was $3,098,730. This calculation, however, was erroneous. If one were to add across the columns the amounts in the "total federal refund due" row, the total would only come to $2,699,952. The evidence presented by plaintiffs, then, actually supported a verdict of $398,778 less than what they claimed it did.

While the jury did not render a verdict exactly commensurate with the figure presented by plaintiffs ($3,098,730), the number it did decide upon ($3,000,000) was still higher than anything supported by the evidence. Accordingly, the court must remit the award to the amount actually supported by the evidence. The award for worker's compensation is thereby reduced from $3,000,000 to $2,699,952. Because the damages in this case were trebled as is statutorily required, this reduction will decrease to total verdict by $300,048 times three, for a total of $900,144.

#### b. Savings Due to Self–Insurance

Defendant also claims that the only year in which the general fund did not contribute to worker's compensation insurance was 1993–1994, so there was no evidence of fraud in the other fiscal years. OPSB misunderstands the jury's verdict. A finding that the worker's compensation was under funded by the general fund does not

require the plaintiffs to show that the general fund made no contribution at all; rather, it requires plaintiffs to show that the money saved by self-insuring was not properly allocated to all three funds. The plaintiffs put on evidence that when worker's compensation insurance was outsourced, OPSB contributed approximately $4 million per year to pay for it, but once it took the operations in-house, the cost dropped dramatically, by around $1.4 million per year. This $1.4 million, then, was saved by OPSB every year that it self-insured, not just the first year. Mr. Samuel testified that the $1.4 million was automatically calculated after the first year. The jury apparently felt that OPSB had an obligation under the law to allocate this savings proportionally between the three funds, and that OPSB failed to do so. The jury could have reached this conclusion by either crediting the testimony of Mr. Samuel or by carefully studying the OPSB accounting documents presented by plaintiffs.

### c. Risk Management Salary Add–Backs

OPSB's third objection to the jury's verdict regarding the worker's compensation insurance is that relators did not justify why salaries paid to risk management employees were added back into their calculation of how much OPSB saved by self-insuring. Plaintiff's Exhibit 28, shows the amount paid in risk management salaries each year, and this exhibit was constructed using the labor statistics in Plaintiff's Exhibit 2, which were obtained directly from the OPSB in discovery.

It is arguable that, because the risk management employees worked on behalf of the entire OPSB and not just on behalf of the General Fund, only a percentage of their salaries should have been added back into the surplus calculation. But OPSB made no attempt at trial to provide the jury with an alternative means of calculating the correct amounts. OPSB presented no evidence of alternative calculations, and, in fact, never even objected to the calcula-

tions or cross-examined the witnesses who had prepared the calculations about how they had reached them. Once the jury determined that salaries should be added back into the calculation, it looked to the evidence before it and reached a reasonable conclusion based upon that evidence. It is even possible that the jury did take this issue into consideration, as its $3,000,-000 verdict was less than the $3,098,730 figure presented by plaintiffs in Exhibit 28.

### H. THIS COURT HAS DISCRETION TO REDUCE THE TOTAL PENALTY FOR FILING THE FALSE CLAIMS

The Fifth Circuit has held that, under the FCA:

[T]he court may exercise discretion where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government. The forfeiture should reflect a fair ratio to damages to insure that the Government completely recoups its losses.

*Peterson v. Weinberger,* 508 F.2d 45, 55 (5th Cir.1975).

The *Peterson* case was decided when the penalty under the FCA was still $2,000 for each false claim filed. Other circuits held, contrary to *Peterson,* that the trial judge had no discretion to reduce the $2,000 penalty per claim. *See United States v. Hughes,* 585 F.2d 284 (7th Cir.1978) ("the forfeiture provision is mandatory; it leaves the trial court without discretion to alter the statutory amount"); *see also United States v. Killough,* 848 F.2d 1523 (11th Cir.1988) (applying pre–1986 statutory limits).

In 1986, the FCA was amended, and the penalty was changed to $5,000 to $10,000 per false claim, leaving the determination of where within those figures the penalty should fall to the district judge. The legislative history indicates that Congress was concerned with preventing courts from us-

ing their discretion to impose only "nominal" damages on liable defendants:

> [The law has been amended] to raise the fixed statutory penalty for submitting a false claim from $2,000 to $10,000 ... [t]he Committee reaffirms the apparent belief of the Act's initial drafters that defrauding the Government is serious enough to warrant an automatic forfeiture rather than leaving final determinations with district courts, possibly resulting in discretionary nominal payments. S. Rep. 99–345, 99th Cong., 2d Sess. 1987.

The amendment may have been an attempt to remove any discretion from the trial court judge, with the exception of deciding where within the $5,000 to $10,000 range the penalty should fall. The actual language of the statutory penalty portion of the FCA, however, did not change at all, except for the amount of the penalty, and, as is shown by the quotation above, the Committee apparantly believed that it was merely "reaffirming" the rationale behind the original Act.

The Fifth Circuit has not had an opportunity to revisit its *Peterson* ruling since the 1986 amendment was passed. This court does not believe that the amendments of the FCA would change the *Peterson* court's reasoning. While it is arguable that Congress's intent was to leave no discretion to the trial judge, the Fifth Circuit has read the statute differently, and until the Fifth Circuit revisits the issue, this court considers the *Peterson* case good law in this circuit and will apply its standards to the case at hand.

Under *Peterson*, the court may exercise its discretion to insure that the penalties assessed "reflect a fair ratio to damages" and that the "Government completely recoups its losses." *Peterson*, 508 F.2d at 55. The damages should not be "excessive and out of proportion."

Here, the damages rendered by the jury on the false claims portion of the verdict totaled $7.4 million dollars. Under the False Claims Act, the court was re-

quired to award the plaintiffs treble damages, while increased the judgment to $22,800,000. In addition, after assessing 1570 claims at $5,000 each, the court added another $7,850,000. for a total of $30,650,000. The judgment, against a public school district responsible for educating children, many of them poor, is for over four times the losses actually incurred by the federal government. The court finds that this judgment, especially in light of importance of protecting the real victims of the School Board's actions—the public school children of New Orleans—is excessive. A penalty of $100,000 is an adequate forfeiture, as the automatic trebling of the verdict as prescribed in the statute has already resulted in a judgment for $15.8 million more than was actually falsely claimed by the OPSB. The court therefore reduces the amount of the statutory penalty from $7,850,000 to $100,000.

## II. MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION

Defendant alleges that under the recently decided *Foulds* case, this action is barred under the Eleventh Amendment because the United States did not intervene in the cases. *Foulds*, 171 F.3d 279. As is explained in the court's ruling on the Defendant's post-trial motions, *supra* at I(F)(2)(b), the *Foulds* case is inapplicable to this case because the OPSB is not "the state." Accordingly, the motion is denied.

## III. MOTION TO ALTER OR AMEND THE JUDGMENT, FILED BY PLAINTIFF, UNITED STATES OF AMERICA

Plaintiff United States has moved this court pursuant to Rule 59 of the Federal Rules of Civil Procedure to increase the jury's verdict of $4.6 million for unemployment compensation insurances overcharges to $6,734,000. If the jury were to have added certain columns of Plaintiff's Exhibits 40A, 40B, 45C, and 45D, it could have reached this number. But as the court held in its ruling on defendant's mo-

tion, *supra* at I(G)(2), these were not the sole pieces of evidence before the jury, and this was certainly not the sole number the jury could have chosen. The jury decided upon a figure within the range of evidence presented to it, and the court does not find that figure unreasonable. Plaintiff's motion is accordingly denied.

## IV. MOTION TO ALTER OR AMEND THE JUDGMENT, FILED BY RELATORS, WILLIAM GARIBALDI AND CARLOS SAMUEL

█ The relators have filed a separate motion pursuant to Rule 59, asking that the court increase their percentage of the award from 25% to 30%. The relators argue that they had to litigate this case entirely on their own, with no help from the government, and that significant stumbling blocks were thrown in their path by defendants, such as responding to discovery requests by providing boxes that contained a "hodgepodge of meaningless documents." While this litigation may have been difficult for the relators, it was no more difficult than most large-scale litigations where the subject is accounting fraud. And while it is true that the plaintiffs were unaided by the government, the 25%–30% range applied by the court already takes into account the fact that the government did not intervene (had the government intervened, the range would have been 15–25%). 31 U.S.C. § 3730. The verdict in this case was exceedingly large, and the relators were further compensated in that they were awarded additional damages and injunctive relief for their retaliation claims against the school board. The court finds that 25% of the jury verdict of the false claims action is sufficient to compensate the relators for their efforts. Accordingly, the motion is denied.

## V. DEFENDANT'S OBJECTIONS TO ORDER GRANTING MOTION FOR EXTENSION OF TIME AND REPORT AND RECOMMENDATION

The relators filed their motion for attorney's fees after the expiration of the four-teen-day deadline set by Fed.R.Civ.P. 54(d)(2)(B) for filing such motions, but within the thirty-day deadline set by this Court's Local Rule 54.3 for filing an application for costs. After filing their motion, the relators moved for an extension for the filing deadline *nunc pro tunc*. The defendant opposed the extension, arguing that the original motion was untimely. The Magistrate Judge granted the extension, and held that the relator's motion was timely filed under *Jones v. Central Bank*, 161 F.3d 311 (5th Cir.1998) (holding that Local Rule 54.3 is a court order satisfying the "unless" clause of Federal Rule 54(d)(2)(B), so motion for attorney fees need not be filed with 14 day limit). He held in the alternative that the motion was timely under *Romaguera v. Gegenheimer*, 162 F.3d 893, 895–96 (5th Cir.1998), where this circuit held that, because a "key function" of Rule 54(d)(2) is to ensure that parties properly notify their opponents of attorney fee requests, and the court had already acknowledged the request in its Order and Reasons accompanying the judgment, the notice requirement was satisfied and plaintiff need not file a motion for attorney fees.

Defendant, Orleans Parish School Board ("OPSB"), has objected to the Magistrate's decision to grant plaintiffs an extension of time in which to file its motion for attorney's fees. The Magistrate's Order is based upon clear Fifth Circuit precedent, explained above, which the court is bound to follow. The court therefore upholds the Magistrate's Order granting the Motion for an Extension of Time.

## VI. OBJECTIONS TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF MAGISTRATE BY PLAINTIFFS

Following the trial, and pursuant to F.R.C.P. 54(d)(2), this court referred the plaintiffs' Motion for Attorney Fees to the Magistrate Judge assigned to this case, for

adjudication pursuant to F.R.C.P. 72(b), and referred the plaintiffs' Notice of Application to Have Costs Taxed to the Clerk of Court, pursuant to Local Rule 54.3. The Magistrate Judge accordingly issued a Report and Recommendation, to which the plaintiffs have objection, and which the court now reviews.

## A. "REASONABLE EXPENSES"

Plaintiffs argue that while the Magistrate Judge assessed attorney fees, he failed to consider "reasonable expenses" in his Report and Recommendation. Federal law provides for the Clerk of Court to determine the taxation of costs for the following expenses:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

28 U.S.C. § 1920.

In this case, this court referred court costs to the clerk of court for determination, and the issue of attorney fees to the Magistrate Judge. To the degree that the "ex-

penses" claimed by relators fall within the categories enumerated in § 1920, then, the Magistrate Judge was correct that the Clerk of Court, and not the Magistrate, should evaluate the costs. For example, the costs of depositions taken (even those taken outside this state), the transportation costs of witnesses attending out-of-state depositions, copying charges for discovery documents, and process server fees are all costs to be taxed by the Clerk of Court.

■ Under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, however, fees, expenses, and costs are three distinct categories. *United States ex. rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402 (9th Cir.1995). There may be some litigation expenses other than attorney fees for which the clerk of court cannot award costs. Expenses such as expert fees, attorney travel costs, and copies of charts used in trial fall into this category. Because "reasonable expenses" is listed in the FCA as compensable, the calculation of these expenses should be addressed by the Magistrate Judge in a Report and Recommendation, to be reviewed by this court.[5] When this court rendered judgment for the relators, the judgment included their "costs, reasonable expenses, and attorney's fees," but this court did not expressly refer the issue of reasonable expenses to the Magistrate Judge when it referred to him the issue of attorney fees. Accordingly, the court hereby expressly refers the matter of litigation expenses to the Magistrate Judge for further hearing under F.R.C.P. 72(b).

## B. DOCUMENTATION OF HOURS SPENT

### 1. INVOICE OF VICTORIA L. BARTELS

The Magistrate Judge neglected to consider an invoice for the services of Victoria

---

5. Paralegal costs may also fall into the category of attorney's fees if the work done by the paralegal was legal work and not clerical work. *See Corman v. Lifecare Acquisitions Corp.*, 1998 WL 185517 (N.D.Tex.1998), *citing In re Mullins*, 84 F.3d 459, 469 (D.C.Cir.

1996). If plaintiffs demonstrated such work and it was not taken into consideration in the hearing before the Magistrate Judge, it should be considered when the Magistrate Judge considers the "reasonable expenses" of plaintiffs.

L. Bartels, a contract attorney. Ms. Bartels' bill was for $8,137.50, for 46.50 hours of work. The court therefore holds that an additional 46.50 hours at Ms. Bartel's lodestar rate must be factored into the calculation of attorney fees.

## 2. PERCENTAGE REDUCTION IN TOTAL HOURS

Plaintiffs have objected to the Magistrate Judge's reduction of their counsels' total hours by 20%. The Magistrate imposed a 10% reduction for "inadequate documentation" and another 10% reduction for lack of "billing judgment." The Magistrate did not impose these reductions based on a finding that plaintiffs had overbilled for a specific number of hours; the reductions were simply generalized penalties. The court will address each reduction in turn.

### a. Inadequate Documentation.

■■■ The Magistrate reduced the relators' hours, in part, because counsel did not specify with precision the subject matter of documents they were reviewing. Given the nature of this case, and the disorganized fashion in which documents were produced to the relators, the court finds that it would be very difficult for the relators to have been more specific. Almost all of the documents were accounting reports from the school board or from their auditors, and these documents were presented to relators (and to the court) in a very disorganized manner. The task of reading these documents to figure out what they were was a job in itself, and counsels' bill should not be reduced merely because the defendant's responses to discovery requests were so disorganized.

The Magistrate furthermore found that many of counsel's reasons for billing were too vague to be compensable. For example, "drafting memorandum" is not as clear as describing the particular memorandum that was being drafted. However, the court finds that while additional clarity might have been helpful, it was not necessary for relators to recover attorney fees.

This was not a case with a multitude of lawyers, where costs could have been exported from other cases in an attempt by the plaintiffs to recover more than was actually necessary. Throughout this litigation, the court was impressed by the streamlined manner in which counsel for relators managed their case. The court finds that a 10% decrease in hours is not justifiable under the circumstances.

### b. Billing Judgment

■■■ The Magistrate Judge also reduced the number of hours because he found some of the billings to be duplicative. For example, he noticed that both Mr. Wessel and Mr. Egan sometimes attended the same depositions, and held that billing for both attorneys would be double-counting. These depositions, however, were of the upper-management of the school board. The school board produced voluminous documents in this case, often immediately before a deposition was to be taken, and it was necessary for plaintiffs to have two lawyers present at the depositions: one to conduct the questioning, and another to handle the documents.

■■■ Similarly, the Magistrate found that Mr. Wessel's decision to bill a two-hour settlement lunch had to be discounted for the amount of time it took Wessel to eat his food. The court, however, does not think that billing this time was an abuse on the part of counsel.

■■■ The court does find merit in the Magistrate's decision to reduce the number of hours billed for work that was non-legal, such as filing pleadings, faxing documents, and serving subpoenas. These hours are not compensable as attorney time. *Abrams v. Baylor College of Medicine,* 805 F.2d 528, 535–36 (5th Cir.1986). These hours, however, do not amount to a 10% reduction in total hours based on lack of "billing judgment." Accordingly, the court holds that the total hours should be reduced by 2% (which comes to approximately $5,000) to account for these non-legal activities.

## C. CALCULATION OF REASONABLE HOURLY RATES

The Magistrate Judge chose to apply hourly rates within the range normally charged by the plaintiffs' case. The court finds that these rates should be increased. Because the court is required when applying the *Johnson* factors to adjust the lodestar to presume that these factors were taken into account when determining an hourly rate it is crucial that the hourly rate accurately reflect the level of work required by the case. Setting the hourly rates of these attorneys in the middle of their usual range does not take into account the particular difficulty of this case. It also does not take into account the lucrative and less risky business these attorneys were precluded from accepting because of the intense and time-consuming nature of this case. The court finds that the hourly rates that should be applied to the attorneys in this case should be at the higher end of their usual ranges. Accordingly, it applies an hourly rate of $250 for the work of Mr. Wessel, $150 for the work of Mr. Egan, $150 for the work of Ms. Lagarde, and $175 for the work of Ms. Bartels.

## D. THE LODESTAR

### 1. CALCULATION

The "lodestar" is the product obtained by multiplying the total hours worked times the reasonable hourly rates for the participating attorneys. *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995), *citing Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Based on the rulings made above, the court calculates the lodestar as follows:

753.67 hours of work by Mr. Wessel, times $250 per hour = $188,417.50

243.25 hours of work by Mr. Egan, times $150 per hour = $36,487.50

6.65 hours of work by Ms. Lagarde, times $150 per hour = $997.50

81.5 hours of work by Ms. Bartels, times $175 per hour = $14,262.50

The total amount, then, is $240,165.00. After reducing this amount by 2% to account for the minor excesses in the billing, the amount comes to $235,361.70.

### 2. LODESTAR REDUCTION OR INCREASE

 With respect to whether the lodestar should be reduced or increased, the court disagrees with some of the Magistrate Judge's findings. Once the lodestar is calculated, the district court may accept it as is or adjust it upward or downward, depending on the circumstances of the case. *Id.* Due to the district court's superior knowledge of the facts and the desire to avoid appellate review of factual matters, the district court has broad discretion in setting the appropriate award of attorneys' fees. *Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1941. The lodestar, however, is presumptively reasonable and should not be modified unless the case is exceptional. *See City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. at 2641, 120 L.Ed.2d 449 (1992); *Watkins v. Fordice,* 7 F.3d 453, 459 (5th Cir.1993). The district court should not enhance the lodestar unless the prevailing party shows that enhancement is necessary to make the award of attorneys' fees reasonable. *Blum v. Stenson,* 465 U.S. 886, 897–98, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). In adjusting the lodestar, the Court considers the twelve factors set out in *Johnson v. Georgia Hwy. Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974):(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability"

of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

■ Since the *Johnson* holding, this analysis has been somewhat augmented and amended. For example, the Supreme Court has "barred any use of the sixth factor." *Walker v. U.S. Dept. of Housing and Urban Dev.*, 99 F.3d 761, 772 (5th Cir.1996), (citing *Burlington*, 505 U.S. at 567, 112 S.Ct. 2638, *see also Shipes v. Trinity Indus.*, 987 F.2d 311, 323 (5th Cir.1993) (the contingent nature of a case cannot serve as a basis for enhancement of attorneys' fee). In addition, the court's application of the *Johnson* factors is limited to those factors that have not already been addressed through the court's calculation of the number of reasonable hours and the rate per attorney. *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir.1998), *Watkins*, 7 F.3d at 459. The Fifth Circuit has warned courts that the first and seventh factors are especially susceptible to "doublecounting." *Walker*, 99 F.3d at 771, 772. More recently, this circuit has held that the novelty and complexity of the issues (factor two), the special skill and experience of counsel (factor three), the quality of representation (factor nine), and the results obtained from the litigation (factor eight) are presumably fully reflected in the lodestar amount. *Shipes*, 987 F.2d at 322. Finally, certain factors are especially important: the time and labor involved (factor one), the customary fee (factor five), the amount involved and result obtained (factor eight), and the experience, reputation, and ability of counsel (factor nine). *Migis*, 135 F.3d at 1047. As a result, the very factors that have been held the most important in some cases have been held presumptively a part of the lodestar in others. "Although upward adjustments of the lodestar figure are still permissible, such modifications are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (citations omitted). The court finds, contrary to the Magistrate Judge's Report and Recommendation, that this is one of those "rare" and "exceptional" cases that merits an increase in the lodestar.

a. **Time and Labor Required, the Skill Requisite to Perform the Legal Service, the Preclusion of Other Employment by the Attorney due to Acceptance of the Case, Whether the Fees Charged were Customary, and the Experience, Reputation, and Ability of the Attorneys**

The court agrees with the Magistrate Judge that the several *Johnson* factors listed above have already been considered in calculating the lodestar. The court therefore holds that no reduction or increase in the lodestar is warranted based on these factors. *See, e.g., Terra–Drill Partnerships Securities Litigation*, 733 F.Supp. 1127, 1130 (S.D.Tex.1990).

b. **The Novelty and Difficulty of the Questions**

The Magistrate Judge held that "the legal questions involved in prosecuting this qui tam action were neither novel nor difficult." Having dealt with the legal substance of this case extensively, the court disagrees. The legal questions involved in this case were novel and challenging. The challenges were not merely the result of obstreperous counsel or complex and technical details. *See Shipes v. Trinity Industries*, 987 F.2d 311 (5th Cir.1993) (novelty and difficulty of Title VII suit involving over 300 plaintiffs and entire spectrum of employment decisions did not make case "rare" or "exceptional"). Here, there was a paucity of Fifth Circuit precedent on many issues, because so few *qui tam* actions are successfully litigated past the early stages. There were many issues that were issues of first impression in this circuit. The parties and the court frequently had to look to the law of other

circuits and districts, and this law was often confused and divided. This case was anything but routine and demanded the attorneys to craft arguments that invited this court, and the Fifth Circuit on appeal, to "make new law." As the *Johnson* court explained:

> Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may "make new law." Instead, he should be compensated for accepting the challenge. *Johnson*, 488 F.2d at 718.

The court did not fully compensate counsel in this case for the novelty of the issues in calculating the hourly rates for the attorneys. Accordingly, the court holds that the lodestar should be increased based on the second *Johnson* factor.

### c. Whether the Fee is Fixed or Contingent

Use of this factor has been expressly disallowed by the Supreme Court. *Burlington*, 505 U.S. at 567, 112 S.Ct. 2638. Accordingly, this court does not consider it.

### d. Time Limitations Imposed by the Client or by the Circumstances

The court finds that the time limits in this case were not unusual. This is not a unique situation where counsel is called in at the last minute to prosecute an appeal or handle matters at a late stage. *See Johnson*, 488 F.2d at 718. The court holds that this factor does not require an increase in the lodestar.

### e. The Amount Involved and Results Obtained

The Magistrate Judge acknowledged that the amount involved in this case was extraordinary and the results obtained were successful. He held, however, that this factor is generally applied when there is partial or limited success to reduce, not to enhance, a fee award. *Hensley v. Ecker-*hart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The *Hensley* case, however, does not mandate using this factor only in response to an attempt to reduce an award. It merely emphasizes that the factor should be used only in extraordinary circumstances. Here, such extraordinary circumstances exist. Not only did the relators' lawyers achieve an extremely successful result for their clients, obtaining a verdict of several million dollars and injunctive relief, the relators' claim accounted for only 25% of the entire verdict (exclusive of the retaliation portion). In essence, the relators' lawyers earned an enormous, multi-million dollar verdict for the United States government, for which the United States paid not one penny. The relators' attorneys will not be compensated by the United States, who chose not to intervene in the suit, and the relators will therefore bear the entire burden of paying their attorneys even though they will receive only a small portion of the judgment and will have to pay their attorneys out of this portion. The court also notes that a major piece of the relators' verdict was injunctive relief (reinstatement), a classic example of the kind of relief that mandates increasing the lodestar under factor eight. Accordingly, the court finds that factor eight requires an increase in the lodestar due to the extraordinary nature of the results achieved here.

### f. The Desirability of the Case

The court agrees with the Magistrate that this case was not undesirable. To the degree that it could be considered undesirable, due to its novel and time-consuming nature, these considerations have already been covered under factor two and in the hourly rates assigned.

### g. The Nature and Length of the Professional Relationship with the Client

The court agrees with the Magistrate Judge that this factor is not applicable here.

### h. Awards in Similar Cases

The court has no information regarding awards in similar cases. Based on the discussion of the twelve factors above, the court finds that the lodestar of $235,361.70 should be increased due to *Johnson* factors two and eight by a factor of 1.5. Accordingly, the court increases the lodestar from $235,361.70 to $353,042.55. Based upon the foregoing analysis,

**IT IS ORDERED** that the defendant's Motion for Judgment as a Matter of Law, or, Alternatively, a New Trial is hereby **GRANTED** in part and **DENIED** in part: the court remits the jury's verdict awarding $3,000,000 in damages for overcharges to the worker's compensation fund to $2,699,952; in addition, the court reduces the statutory forfeitures assessed in this case from $7,850,000 to $100,000. The final judgment for the False Claims Act portion of the case, excluding the Retaliation claims, then, will be reduced from $30,650,000 to $22,899,856.

**IT IS FURTHER ORDERED** that defendant's Motion to Dismiss is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Motion to Alter or Amend the Judgment, filed by plaintiff, United States of America is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Motion to Alter or Amend the Judgment, filed by the relators, William Garibaldi and Carlos Samuel, is hereby **DENIED.**

**IT IS FURTHER ORDERED** that defendant's Objections to Order Granting Motion for Extension of Time and Report and Recommendation are hereby **DENIED.**

**IT IS FURTHER ORDERED** that upon review of the Magistrate's Report and Recommendation and the relators' Objections to Proposed Findings, Conclusions, and Recommendation of Magistrate, relators' Motion for Attorney's Fees is hereby **GRANTED** and that judgment be entered in favor of relators William Garibaldi and Carlos Samuel for attorney's fees in the amount of $353,042.55; and to the extent that "reasonable expenses" are not included in costs to be taxed by the Clerk of Court, the calculation of these expenses is hereby **REFERRED** to the Magistrate for adjudication under F.R.C.P. 72(b).